# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 7, 2008 Session

## STEVEN WATERS ET AL. v. REAGAN FARR, COMMISSIONER OF REVENUE FOR THE STATE OF TENNESSEE

**Appeal by Permission from the Court of Appeals, Eastern Section
Chancery Court for Loudon County
No. 10710      Frank V. Williams, III, Chancellor**

---

**No. E2006-02225-SC-R11-CV - Filed July 24, 2009**

---

Effective January 1, 2005, the Tennessee General Assembly enacted a tax on the possession of unauthorized substances for the purpose of generating revenues to assist state and local law enforcement agencies in their efforts to combat drug crimes. Subsequently, Steven Waters was assessed with taxes, penalty, and interest in the total amount of $55,316.84 by the Tennessee Department of Revenue after purchasing nearly a kilogram of cocaine from a confidential informant. In a declaratory judgment suit in the Chancery Court of Loudon County, Waters challenged the constitutionality of the statute on grounds of self-incrimination, double jeopardy and due process. The chancellor declared the statute unconstitutional and set aside the assessment. On direct appeal, the Court of Appeals affirmed, holding that the enactment exceeded the General Assembly's taxing power under article II, section 28 of the Tennessee Constitution. Initially, we hold that the statute imposing the tax on unauthorized substances does not violate the constitutional protections against self-incrimination and double jeopardy or abridge the guarantee of procedural due process. Because, however, the tax cannot be classified as either a tax on merchants, a tax on peddlers or a tax on privileges, as authorized by our state constitution, the judgment of the Court of Appeals is affirmed.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., and WILLIAM M. BARKER, J., joined. WILLIAM C. KOCH, JR., J. filed a separate opinion concurring in part and dissenting in part, in which CORNELIA A. CLARK, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Brad H. Buchanan, Assistant Attorney General, for the appellant, Reagan Farr, Commissioner of Revenue for the State of Tennessee.[1]

---

[1] In accordance with Tennessee Rule of Appellate Procedure 19(c), Reagan Farr, the current Commissioner of Revenue, has been substituted as a party in this appeal in the place of his predecessor, Loren L. Chumley.

A. Philip Lomonaco, Knoxville, Tennessee, for the appellee, Steven Waters.

**OPINION**

**Facts**

On April 25, 2005, Steven Waters ("Waters"), a fifty-one-year-old resident of Loudon County, was arrested after purchasing nearly a kilogram of cocaine from a confidential informant as part of a "reverse sting" conducted by officers in the Narcotics Unit of the Knox County Sheriff's Office. Based upon Waters' possession of the cocaine, the Tennessee Department of Revenue ("Department of Revenue") subsequently issued an assessment under the newly enacted tax on unauthorized substances.[2] Waters then challenged the constitutionality of the tax by filing a declaratory judgment action against the Commissioner of Revenue of Tennessee ("Commissioner").

By the time of his arrest, Waters, a carpenter specializing in trim and interior work in new homes, had worked in and around Loudon County for twenty of his thirty-five years in the trade. The evidence in the record indicates that at some point during this period of time, Waters began to use cocaine on a "[w]eekend basis." He claimed that the substance "[k]ind of made [him] feel better," and gave him "a little burst" to make him "feel better about work." While explaining that he regularly purchased his cocaine in an area "down off of Western Avenue" in Knox County, he insisted that he had never sold the drug to anyone. He believed that until his arrest, his wife, Naomi Waters, had been unaware of his use of the illegal substance.

On the morning of April 25, 2005, Waters received a telephone call from an individual he had known for about a year and a half, and with whom he had used cocaine in the past. The individual informed Waters that she had nine kilograms of "nearly pure" cocaine from Miami and that she was "trying to move it and get out of town fast." She offered to sell the cocaine at a price of $17,000 per kilogram and arranged to meet Waters in the parking lot of a bakery in Knoxville. After trying a small amount of the cocaine as a sample, Waters acknowledged the high quality of the drug but declined to purchase. Later that evening, the woman telephoned again and offered the cocaine at a reduced price of $12,000 per kilogram. Waters, believing that the street value was far greater than the price, consented to the terms. At the hearing, he explained that he had planned to use the cocaine "a little at a time" and claimed that he had no intention to either sell the substance or give it to anybody else.

Unbeknownst to Waters, the individual from whom he had agreed to purchase cocaine was a confidential informant working in cooperation with the Narcotics Unit of the Knox County Sheriff's Office ("Sheriff's Office"). Captain Bernie Lyon, a twenty-seven-year veteran of the Sheriff's Office, testified that he had been acquainted with the informant for approximately twenty years, that he had known her to use drugs in the past, and that he had instructed her to try to sell the cocaine to Waters. Captain Lyon further testified that the "going price" for a gram of cocaine "on

---

[2] 2004 Tenn. Pub. Acts 1840 (codified at Tenn. Code Ann. §§ 67-4-2801 to -2811 (Supp. 2004)). The tax on unauthorized substances became effective on January 1, 2005, less than four months prior to Waters' arrest.

the street" was about $100 per gram.[3]  After Waters had agreed on the purchase price, Captain Lyon and Sergeant James Hammond, the supervisor of the Narcotics Unit, provided the informant with a brick of cocaine from the drug vault at the Sheriff's Office.  The package weighed 999.2 grams, indicating that the estimated street value of the cocaine Waters had agreed to purchase for $12,000 could have been as high as $99,200.

The officers followed the informant to the parking lot of a restaurant near the intersection of Walker Springs Road and Kingston Pike in Knoxville, where Waters paid $12,000 for the drugs. When the informant and Waters drove their respective vehicles away from the scene, Captain Lyon followed the informant to retrieve the money as Sergeant Hammond and several other officers followed Waters.  After about a quarter of a mile, the officers apprehended Waters, searched his truck, and recovered the cocaine.  Waters was then arrested and taken to jail.  At trial, both Captain Lyon and Sergeant Hammond acknowledged that there was no evidence suggesting that Waters had ever sold drugs or intended to sell any drugs, including the cocaine he had purchased from the informant.

In accordance with a policy developed in January of 2005, Karen Phillips, the drug technician at the Sheriff's Office, completed a form for the Department of Revenue documenting the arrest and the amount of cocaine seized.  The form provided that 75% of the money collected from the tax on the cocaine that Waters had possessed was to be distributed to the Sheriff's Office, with the remaining 25% payable to the Department of Revenue.[4]  On or about May 20, 2005, Eugene Johnson of the Department of Revenue's Unauthorized Substance Tax Reports office in Knoxville hand-delivered to the Waters residence a Notice of Assessment and Demand for Payment ("Assessment") in the sum of $55,316.84, which included $49,940 in tax liability[5] plus $5,376.84 in penalty and interest.  One week later, the Department of Revenue notified Waters by mail that it had filed a lien against the residence he owned jointly with his wife in order to secure payment of the tax.  Further, the Department of Revenue sent a Levy Notification and Notice of Levy to several banks in East Tennessee in an attempt to recover any assets that those banks might have been holding for Waters.

---

[3] Captain Lyon explained that street dealers often dilute the cocaine "so they can stretch their powder out a little bit further."  He also stated that he had no knowledge of the purity level of the cocaine sold to Waters, and that the substance was not tested by the Tennessee Bureau of Investigation other than to prove that it was, in fact, cocaine. Waters testified that the informant told him the cocaine was "nearly pure."

[4] See Tenn. Code Ann. § 67-4-2809(b)(2) (Supp. 2004).

[5] "An excise tax is levied on unauthorized substances possessed, either actively or constructively, by dealers at the following rates: . . . (3) Fifty dollars ($50.00) for each gram, or fraction thereof, of cocaine."  Tenn. Code Ann. § 67-4-2803(a) (Supp. 2004) (codified as amended at Tenn. Code Ann. § 67-4-2803(a)(4) (2006)).  Although the cocaine that Waters purchased weighed 999.2 grams, the amount of the Assessment was apparently based on the 998.8 grams that Phillips had written on the drug tax registration form that she faxed to the Department of Revenue.

Afterwards, the Department of Revenue received approximately $3,800 from the checking account Waters had at First Tennessee Bank.[6]

**Procedural History**

On July 12, 2005, Waters and his wife, who was subsequently dismissed as a party to the litigation, filed suit in the Chancery Court for Loudon County against the Commissioner, seeking declaratory and injunctive relief.[7] The Office of the Attorney General was served with a copy of the complaint, appeared on behalf of the Commissioner, and represented the Commissioner throughout the course of these proceedings.[8] Waters alleged that Tennessee's tax on unauthorized substances violated the state and federal constitutional protections against self-incrimination and double jeopardy and also failed to afford due process of law.

At the conclusion of the proceeding, the trial court abated the assessment, ruling that the tax on unauthorized substances violated the state and federal constitutional prohibitions against compelled self-incrimination, imposed a criminal rather than a civil penalty, and authorized a tax far in excess of the amount Waters paid for the illegal drugs. The trial court further held that the Department of Revenue's procedures for assessment and collection of the tax on unauthorized substances failed to satisfy the procedural due process requirements of the state and federal constitutions. Because a jury had not been empaneled in Waters' criminal prosecution, the trial court

---

[6] Waters testified that the Tennessee Department of Safety took possession of his truck and gave him the option of purchasing it back from the state for its value of $5,000. Counsel for the Commissioner stated that any taking of Waters' truck "was not to satisfy this tax assessment," and that the Department of Revenue had no knowledge of such taking. No representative of the Department of Safety testified.

[7] The Commissioner asserts that the procedure outlined in Tennessee Code Annotated § 67-1-1801(a)(1)(B) (2006) provides an individual with a fair opportunity to challenge an assessment for possession of unauthorized substances. See Tenn. Code Ann. § 67-4-2807 (2006 & Supp. 2008). While we agree, a taxpayer also has the option of presenting a facial challenge to the constitutionality of a tax statute by filing a declaratory judgment action. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 840 (Tenn. 2008).

[8] Nothing in this opinion casts doubt upon the long-standing requirement in this state that parties who challenge a statute's constitutionality through a declaratory judgment action must serve notice of their suit on the Office of the Attorney General. Tenn. Code Ann. § 29-14-107(b) (2000); Cummings v. Shipp, 3 S.W.2d 1062, 1063 (Tenn. 1928); see also Tenn. R. Civ. P. 24.04 (expanding the notice requirement beyond declaratory judgment actions). Waters complied with this requirement and gave proper notice of his federal and state constitutional challenges by serving a copy of his complaint on the Attorney General's Office. Brad H. Buchanan, an attorney in the Office's Tax Division, filed the answer to the complaint and appeared on the Commissioner's behalf at trial and during this appeal. Thus, the people's interests have been ably represented throughout this proceeding. Moreover, the Attorney General's Office, perhaps in an effort to facilitate a ruling on the merits of the claim rather than any procedural deficiency, has not challenged the lack of joinder as a party. See Cummings v. Beeler, 223 S.W.2d 913, 916 (Tenn. 1949) (indicating that the Attorney General be named "a party defendant in any proceeding where the constitutionality of the Act of the legislature is before the Court on declaratory judgments proceeding"). Under all of these circumstances, any issue as to joinder has been waived. See Tenn. R. App. P. 36(a).

-4-

found that Waters had not yet been exposed to double jeopardy. An allegation of entrapment was not addressed.[9]

On direct appeal, the Court of Appeals affirmed the trial court but based its ruling upon different grounds. The Court of Appeals unanimously held that the tax on unauthorized substances exceeded the Tennessee General Assembly's power to impose a privilege tax as provided in article II, section 28 of the Tennessee Constitution.[10] Waters v. Chumley, No. E2006-02225-COA-R3-CV, 2007 WL 2500370, at *2 (Tenn. Ct. App. Sept. 6, 2007). In an opinion written by Judge (now Justice) Sharon G. Lee, the Court of Appeals described the legislature's power to tax privileges as "extremely broad" but not entirely unlimited, observing that the General Assembly may not levy a privilege tax that is "*arbitrary, capricious, or wholly unreasonable.*" Id. (quoting Hooten v. Carson, 209 S.W.2d 273, 274 (Tenn. 1948)). "Because [the Legislature] seeks to levy a tax on the privilege to engage in an activity that . . . has [been] previously declared to be a crime, not a privilege," the Court of Appeals "necessarily conclude[d] that the Drug Tax is arbitrary, capricious, and unreasonable, and therefore, invalid under the Constitution of this state." Id. at *3. The Court of Appeals also determined that a tax on unauthorized substances was not "consistent with the rationale supporting the imposition of a privilege tax, which holds that such a tax recompenses the state for the secure and nurturing environment it has provided the activity or occupation upon which the tax is levied." Id. The opinion characterized the state's proper role as one of deterrence, rather than one of protection or sustenance, of individuals in Tennessee who possess illegal substances. Id.

The Court of Appeals, while holding that the tax on unauthorized substances violated the legislature's taxing powers under our state constitution, did not address self-incrimination or due process protections, the grounds upon which the trial court had relied. Because this case involves important questions of constitutional authority and statutory interpretation, this Court granted the Commissioner's application for permission to appeal.

**Standard of Review**

When called upon to construe a statute, we must first ascertain and then give full effect to the General Assembly's intent and purpose. Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008). Our chief concern is to carry out the legislature's intent without either broadening or restricting the statute beyond its intended scope. Houghton v. Aramark Educ.

_____

[9] Based upon the events of April 25, 2005, a Knox County grand jury indicted Waters for possession of more than three hundred grams of cocaine with intent to deliver, a Class A felony providing for a prison sentence of between fifteen and sixty years and a fine of up to $500,000. Tenn. Code Ann. § 39-17-417(j)(5) (Supp. 2004); Tenn. Code Ann. § 40-35-111(b)(1) (2003). While Waters pursued his declaratory judgment action in the trial court, the criminal proceedings were held in abeyance. On January 29, 2008, Waters pleaded guilty to the lesser-included offense of possession with intent to deliver cocaine, a Class B felony, Tenn. Code Ann. § 39-17-417(a)(4), (b) (Supp. 2004); he was placed on probation for a term of eight years and ordered to pay $3,427 in fines, court costs, and fees.

[10] "Review generally will extend only to those issues presented for review," but an appellate court "may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Tenn. R. App. P. 13(a). We believe that this was an appropriate circumstance for the Court of Appeals to exercise such discretion.

Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). Every word in a statute "is presumed to have meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature." In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005) (quoting Marsh v. Henderson, 424 S.W.2d 193, 196 (Tenn. 1968)). When the statutory language is clear and unambiguous, we apply its plain meaning without complicating the task. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). When a statute is ambiguous, however, we may reference the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. Colonial Pipeline, 263 S.W.3d at 836. We presume that the General Assembly was aware of its prior enactments and knew the state of the law at the time it passed the legislation. Owens, 908 S.W.2d at 926.

Issues of constitutional interpretation are questions of law, which we review de novo without any presumption of correctness given to the legal conclusions of the courts below. Colonial Pipeline, 263 S.W.3d at 836. It is well-settled in Tennessee that "courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties." State v. Taylor, 70 S.W.3d 717, 720 (Tenn. 2002) (citing Owens, 908 S.W.2d at 926). Our charge is to uphold the constitutionality of a statute wherever possible. State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007). "In evaluating the constitutionality of a statute, we begin with the presumption that an act of the General Assembly is constitutional." Id. (quoting Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003)); see also Vogel v. Wells Fargo Guard Servs., 937 S.W.2d 856, 858 (Tenn. 1996) ("A statute comes to a court 'clothed in a presumption of constitutionality [since] the Legislature does not intentionally pass an unconstitutional act.'" (quoting Cruz v. Chevrolet Grey Iron, Div. of Gen. Motors Corp., 247 N.W.2d 764, 766 (Mich. 1976)) (alteration in original)). The presumption of constitutionality applies with even greater force when a party brings a facial challenge to the validity of a statute. Gallaher, 104 S.W.3d at 459. In such an instance, the challenger must establish that no set of circumstances exists under which the statute, as written, would be valid. Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006) (quoting Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 525 (Tenn. 1993)); United States v. Salerno, 481 U.S. 739, 745 (1987).

### History of Taxes on Unauthorized Substances

Waters challenges the constitutionality of Tennessee's taxing statute on unauthorized substances, both as to its facial validity and as to the application of the statute to these specific circumstances. In considering his claims, it is helpful to examine the history of legislation imposing taxes on unauthorized substances.

### I. Taxes Levied by the Federal Government and Other States

The taxing of illegal activities, including the possession and sale of illegal substances, has a long history at both the federal and state level. Over 150 years ago, the United States Supreme Court held that Congress could require licenses for businesses that were otherwise forbidden by the laws of the states in which they were located and could impose penalties for the failure to purchase such licenses. License Tax Cases, 72 U.S. 462 (1866). Throughout the years, our highest Court has consistently upheld the principle that gains from unlawful activities are taxable. See James v. United

States, 366 U.S. 213, 221-22 (1961) (overruling Comm'r of Internal Revenue v. Wilcox, 327 U.S. 404 (1946), to hold that embezzled funds are income taxable to the embezzler); Rutkin v. United States, 343 U.S. 130, 137-38 (1952) (concluding that money obtained by extortion is taxable income, and observing that "[t]here has been a widespread and settled administrative and judicial recognition of the taxability of unlawful gains of many kinds under [the Internal Revenue Code]"); United States v. Sullivan, 274 U.S. 259, 263 (1927) (holding that the federal government may tax income from a business that is illegal under federal law). While "[t]he Court has repeatedly indicated that the unlawfulness of an activity does not prevent its taxation," Marchetti v. United States, 390 U.S. 39, 44 (1968), it also has established that this principle may reach its limits when either the tax itself or the governmental procedures to collect the tax collides with the taxpayer's constitutional rights. Haynes v. United States, 390 U.S. 85, 100 (1968) (holding that "the constitutional privilege against self-incrimination provides a full defense" to alleged violations of a firearm registration requirement directed primarily at people who possessed the firearm illegally); Grosso v. United States, 390 U.S. 62, 65-67 (1968) (holding that a federal occupational tax on wagering, which required a gambler to provide, upon threat of criminal prosecution, information that he might reasonably have supposed would be made available to prosecuting authorities, violated the gambler's Fifth Amendment privilege against self-incrimination); Marchetti, 390 U.S. at 48-49 (same).

The taxation of illegal drugs at the federal level has followed a path similar to that of taxes on other unlawful activities. In fact, "most domestic drug regulations prior to 1970 generally came in the guise of revenue laws, with the Department of the Treasury serving as the Federal Government's primary enforcer." Gonzales v. Raich, 545 U.S. 1, 10 (2005). The leading statute in this area was the Harrison Narcotic Act of 1914, 38 Stat. 785 (repealed 1970), which sought "to exert control over the possession and sale of narcotics, specifically cocaine and opiates, by requiring producers, distributors, and purchasers to register with the Federal Government, by assessing taxes against parties so registered, and by regulating the issuance of prescriptions." Gonzales, 545 U.S. at 10-11. Congress later passed the Marihuana Tax Act of 1937, 50 Stat. 551 (repealed 1970), which "[l]ike the Harrison Act . . . did not outlaw the possession or sale of marijuana outright" but imposed similar registration and reporting requirements for individuals who produced, imported, distributed, sold, or dealt marijuana and "required the payment of annual taxes in addition to transfer taxes whenever the drug changed hands."[11] Gonzales, 545 U.S. at 11. The United States Supreme Court, citing the cases preserving taxes on other types of illegal activities, upheld the constitutionality of both the Harrison Act and the Marihuana Tax Act. United States v. Sanchez, 340 U.S. 42, 44-45 (1950) (upholding Marihuana Tax Act and noting that "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed"); United States v. Doremus, 249 U.S. 86 (1919) (upholding Harrison Act).

Both the Harrison Act and the Marihuana Tax Act were repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (1970). Prior to the

---

[11] "[W]hile the Marihuana Tax Act did not declare the drug illegal per se, the onerous administrative requirements, the prohibitively expensive taxes, and the risks attendant on compliance practically curtailed the marijuana trade." Gonzales, 545 U.S. at 11.

repeal of the Marihuana Tax Act, however, the Supreme Court had the opportunity to once again consider its constitutional ramifications. Dr. Timothy Leary, a former Harvard professor and notorious advocate for psychedelic drugs, was convicted of knowingly transporting, concealing and facilitating the transportation and concealment of marijuana without paying the transfer tax required by the Marihuana Tax Act. Leary v. United States, 395 U.S. 6, 11 (1969). Leary challenged his conviction, and the Court concluded that "read according to its terms, the Marihuana Tax Act compelled [Leary] to expose himself to a 'real and appreciable risk' of self-incrimination, within in the meaning of our decisions in Marchetti, Grosso and Haynes." Leary, 395 U.S. at 16. Because Leary's invocation of the privilege against self-incrimination was proper and constituted a complete defense to the charge of violating the Marihuana Tax Act, the Court reversed his conviction. Id. at 29. Although the 1970 Act was intended to replace the drug tax laws with "a comprehensive regime to combat the international and interstate traffic in illicit drugs," Gonzales, 545 U.S. at 12, the shift in federal policy was also, at least in part, a response to the Supreme Court's rejection in the Leary case of the federal taxation scheme for illegal drugs. Id. at 11-12; Frey v. United States, 558 F.2d 270, 271 (5th Cir. 1977) (noting that although Leary did not hold the Marihuana Tax Act to be unconstitutional, it "dealt the . . . Act a crippling blow in holding its order form requirement amounted to self-incrimination"). Since the 1970 Act became effective, the federal government has used the criminal laws, rather than the tax code, to regulate the possession and trade of illegal drugs.

Although the taxation of illicit substances has fallen out of favor at the federal level, a number of states have passed drug stamp taxes, so named for the stamps that individuals who possess or sell an unauthorized substance are required to purchase from their state's revenue department and affix to the substance.[12] Unlike the federal drug tax laws, which were the primary method of enforcement against the drug trade, the state drug stamp taxes co-exist with criminal statutes that punish the possession and sale of drugs through the penal system. The state drug stamp taxes, however, do share one significant characteristic with their federal counterparts, in that their constitutionality has been challenged repeatedly in the courts.

Thirty of the other forty-nine states have passed statutes that tax the possession or sale of unauthorized substances. Twenty-one of these thirty states have drug stamp taxing statutes that are still codified,[13] while nine of the states have subsequently repealed legislation requiring drug

_____

[12] States, like the federal government, have taxed illegal activities for many years. This Court has held that illegal activity may be taxed, Foster v. Speed, 111 S.W. 925, 925-26 (Tenn. 1908), and that the taxation of an illegal activity does not give the taxpayer a license to violate the criminal laws of this state. Blaufeld v. State, 53 S.W. 1090, 1091-92 (Tenn. 1899); Palmer v. State, 13 S.W. 233, 235 (Tenn. 1890). The decision in Foster drew upon a treatise on taxation written by noted constitutional scholar and Michigan Supreme Court Justice Thomas M. Cooley. See Thomas M. Cooley, A Treatise on the Law of Taxation 242 (3d ed. 1903) (noting that "one purpose of taxation sometimes is to discourage a business, and perhaps put it out of existence"). See also Youngblood v. Sexton, 32 Mich. 406, 422 (1875) (Cooley, J.).

[13] Ala. Code §§ 40-17A-1 to -16 (2003); Conn. Gen. Stat. §§ 12-650 to -660 (2008); Ga. Code Ann. §§ 48-15-1 to -11 (2005); Idaho Code Ann. §§ 63-4201 to -4211 (2007) (as amended by 1990 Idaho Sess. Laws, ch. 179, § 1); 35 Ill. Comp. Stat. 520/1-520/26 (2006); Ind. Code §§ 6-7-3-1 to -20 (2007); Iowa Code Ann. §§ 453B.1-.16 (2006); Kan.

(continued...)

stamps.[14]  Of the twenty-three other state drug stamp taxes that have been considered by state appellate courts, eleven have been upheld as constitutional.[15]  Twelve of the state drug stamp taxes, however, have been found to violate federal and state constitutional protections, most commonly the Fifth Amendment rights against self-incrimination or double jeopardy and their state equivalents.[16]  Four states have recently considered, but rejected, the idea of a tax on unauthorized substances,[17]

---

[13](...continued)
Stat. Ann. §§ 79-5201 to -5212 (1997 & Supp. 2008); Ky. Rev. Stat. Ann. §§ 138.870-.889 (2006); La. Rev. Stat. Ann. §§ 47:2601-:2610 (Supp. 2009); Mass. Gen. Laws ch. 64K, §§ 1-14 (2001); Minn. Stat. §§ 297D.01-.13 (2007); Neb. Rev. Stat. §§ 77-4301 to -4316 (2003); Nev. Rev. Stat. §§ 372A.010-.130 (1997); N.C. Gen. Stat. §§ 105-113.105 to .113 (2007) (as amended by 1995 N.C. Sess. Laws, ch. 340, § 1, eff. Oct.1, 1995; 1997 N.C. Sess. Laws ch. 292, § 1, eff. Oct. 1, 1997; 1998 N.C. Sess. Laws ch. 218, eff. Oct. 31, 1998); Okla. Stat. tit. 68, §§ 450.1-.9 (2001); R.I. Gen. Laws §§ 44-49-1 to -16 (2005); S.C. Code Ann. §§ 12-21-5010 to -6050 (2000); Tex. Tax Code Ann. §§ 159.001-.301 (2008); Utah Code Ann. §§ 59-19-101 to -107 (2008); Wis. Stat. §§ 139.87-.96 (2009) (as amended by 1997 Wis. Sess. Laws 27, § 2979m, eff. Jan. 1, 1998).

[14] Ariz. Rev. Stat. § 42-3401 to -3406 (repealed by 1998 Ariz. Sess. Laws 1998, Ch. 1, § 157, eff. Jan. 1, 1999); Colo. Rev. Stat. §§ 39-28.7-101 to -109 (repealed by 1996 Colo. Sess. Laws 1996, S.B. 96-133, § 2, eff. Mar. 25, 1996); Fla. Stat. § 212.0505 (repealed by 1995 Fla. Laws 1995, c. 95-140, § 7, eff. July 10, 1995); Me. Rev. Stat. Ann. tit. 36, §§ 4433-4436 (repealed by 1995 Me. Laws 1995, c. 281, § 24, eff. June 21, 1995); Mich. Comp. Laws §§ 335.301-.307 (repealed by 1978 Mich. Pub. Acts 1978, No. 368, § 25101, eff. Sept. 30, 1978); Mont. Code Ann. §§ 15-25-101 to -123 (repealed by 1995 Mont. Laws Sec. 74, Ch. 18; Sec. 4, Ch. 446); N.M. Stat. §§ 7-18A-1 to -7 (repealed by 1995 N.M. Laws 1995, ch. 101, § 1, eff. July 1, 1995); N.D. Cent. Code §§ 57-36.1-01 to -16 (repealed by 1995 N.D. Laws, ch. 545, § 2, eff. Aug. 1, 1995); S.D. Codified Laws § 10-50A (repealed by 1987 S.D. Sess. Laws 1987, ch 111, §§ 1-15).

[15] See Milner v. State, 658 So.2d 500 (Ala. Civ. App. 1994); Covelli v. Comm'r of Revenue Servs., 668 A.2d 699 (Conn. 1995), vacated, Covelli v. Crystal, 518 U.S. 1031, aff'd on remand, Covelli v. Comm'r of Revenue Servs., 683 A.2d 737 (Conn. 1996), cert. denied, Covelli v. Crystal, 520 U.S. 1174 (1997); State v. Lange, 531 N.W.2d 108 (Iowa 1995); State v. Gulledge, 896 P.2d 378 (Kan. 1995); Commonwealth v. Bird, 979 S.W.2d 915 (Ky. 1998); Sisson v. Triplett, 428 N.W.2d 565 (Minn. 1988); State v. Stubblefield, 543 N.W.2d 743 (Neb. 1996); State v. Ballenger, 472 S.E.2d 572 (N.C. Ct. App. 1996), aff'd per curiam, 481 S.E.2d 84 (N.C. 1997); White v. State, 900 P.2d 982 (Okla. Crim. App. 1995); McMullin v. S.C. Dep't of Revenue & Taxation, 469 S.E.2d 600 (S.C. 1996); Ex parte Ward, 964 S.W.2d 617 (Tex. Crim. App. 1998).

[16] See State v. Maurello, 932 P.2d 851 (Colo. Ct. App. 1997) (double jeopardy); Fla. Dep't of Revenue v. Herre, 634 So.2d 618 (Fla. 1994) (self-incrimination); State v. Smith, 813 P.2d 888 (Idaho 1991) (self-incrimination); Wilson v. Dep't of Revenue, 662 N.E.2d 415 (Ill. 1996) (double jeopardy); Bryant v. State, 660 N.E.2d 290 (Ind. 1995) (double jeopardy); Comm'r of Revenue v. Mullins, 702 N.E.2d 1 (Mass. 1998) (double jeopardy); Dep't of Revenue v. Kurth Ranch, 511 U.S. 767 (1994) (double jeopardy); Desimone v. State, 996 P.2d 405 (Nev. 2000) (double jeopardy); N.M. Taxation & Revenue Dep't v. Whitener, 869 P.2d 829 (N.M. Ct. App. 1993) (double jeopardy); State v. Roberts, 384 N.W.2d 688 (S.D. 1986) (self-incrimination); Brunner v. Collection Div., 945 P.2d 687 (Utah 1997) (double jeopardy); State v. Hall, 557 N.W.2d 778 (Wis. 1997) (self-incrimination).

[17] These four states are Arkansas, see Arkansas News Bureau, Bill to Tax Illegal Drugs Stalls in House Committee (Mar. 21, 2007), http://www.mpp.org/states/arkansas/news/bill-to-tax-illegal-drugs-stalls.html; Mississippi, see Tennessee Drug Dealers Required to Buy Tax Stamps (July 13, 2005), http://www.redorbit.com/news/health/173172/ tennessee_drug_dealers_required_to_buy_tax_stamps/; New York, see Keith B. Richburg, New York 'Crack Tax' Proposal Is Derided, Washington Post, Feb. 17, 2008, at A05; and Virginia, see Bad Bills: Drug Tax Dies in Virginia Legislature, 472 Drug War Chronicle (Feb. 9, 2007), available at http://stopthedrugwar.org/chronicle/472/

(continued...)

while the remaining fifteen states and the District of Columbia do not appear to have proposed such legislation.[18]

### B. Tennessee's Tax on Unauthorized Substances

It was in this legislative environment that the Tennessee General Assembly considered and passed a tax on unauthorized substances in 2004.[19]  The statute is codified in Chapter 4 of Title 67 of the Tennessee Code Annotated, which is entitled "Privilege and Excise Taxes."  The stated purpose of the statute is "to generate revenue for state and local law enforcement agencies for use by those agencies to investigate, combat, prevent and reduce drug crimes, and for the general fund." Tenn. Code Ann. § 67-4-2801 (2006).  The statute levies "[a]n excise tax . . . on unauthorized substances possessed, either actually or constructively, by dealers" at specified rates for a variety of enumerated substances, including marijuana stems and stalks, marijuana plants, cocaine, "any other controlled substance or low-street-value drug," and illicit alcoholic beverages.  Tenn. Code Ann. § 67-4-2803.  "Dealer" is defined in the statute as "any of the following: (A) A person who actually or constructively possesses more than [the prescribed amounts of the enumerated unauthorized substances]; or (B) A person who . . . possesses an illicit alcoholic beverage for sale."  Tenn. Code Ann. § 67-4-2802(3) (2006).  Significantly, the statute defines "dealer" only in terms of possession and levies the tax only on unauthorized substances possessed.

The enactment prescribes a clear procedure for compliance.  Those in possession of the illegal drugs are required to purchase tax stamps issued by the Department of Revenue and permanently affix those stamps to the unauthorized substances in their possession in order to verify that they have paid the necessary tax.  Tenn. Code Ann. §§ 67-4-2805(a), -2806 (2006).  "The tax is payable within forty-eight (48) hours after the dealer acquires actual or constructive possession of a non-tax-paid unauthorized substance"; otherwise, "the tax will become delinquent and shall accrue penalty and interest."  Tenn. Code Ann. § 67-4-2806 (2006).  The Department of Revenue will assess a tax against any "dealer who possesses an unauthorized substance to which a stamp has not been affixed."  Tenn. Code Ann. § 67-4-2807.  "The dealer may seek review of the assessment as provided in" Tennessee Code Annotated section 67-1-1801, et seq.  Id.  If a local or state law enforcement agency in Tennessee seizes an unauthorized substance to which a tax stamp has not been affixed, the agency must make a report to the Commissioner within forty-eight hours.  Tenn.

---

[17](...continued)
drug_tax_bill_dies_in_virginia_legislature.

[18] The states that apparently have not formally proposed or otherwise considered legislation to tax the possession or sale of unauthorized drugs include Alaska, California, Delaware, Hawaii, Maryland, Missouri, New Hampshire, New Jersey, Ohio, Oregon, Pennsylvania, Vermont, Washington, West Virginia and Wyoming.

[19] Both the House sponsor, Charles Curtiss (D-Sparta) and the Senate sponsor, Randy McNally (R-Oak Ridge), stressed that similar taxes had been enacted in "twenty-seven other states" and that the language of the Tennessee legislation was patterned after the existing tax in North Carolina.  See, e.g., Statement of Rep. Curtiss, House Session, May 19, 2004; Statement of Sen. McNally, Senate Session, May 10, 2004.  Senator McNally also observed that "the reason for . . . the threshold figures that trigger the tax [are] that's what was used in the North Carolina statute that had been successfully defended in court."  Statement of Sen. McNally, Senate Session, May 20, 2004.

Code Ann. § 67-4-2805(b). The "state or local law enforcement agency that conducted the investigation of a dealer that led to the assessment" will receive 75% of the tax proceeds when such a report is made, with the remaining 25% to be paid into the general fund. Tenn. Code Ann. § 67-4-2809(b)(2).

According to a spokesperson for the Department of Revenue, the enactment of the tax on unauthorized substances required the creation of a ten-person tax agency at a one-time cost of $1.2 million. Cruz, Tennessee Targets Dealers, Users with New Levy, The Tennessean, Dec. 29, 2004, at 1A. The Department of Revenue forecast the annual costs of enforcement to be $800,000. Id. Data from the Department of Revenue indicates that the total collections made under Tennessee's unauthorized substances tax were $298.30 in fiscal year ("FY") 2005,[20] $884,851.49 in FY 2006, $1,578,182.26 in FY 2007, $1,794,808.47 in FY 2008, and $756,819.59 through the first half of FY 2009. See Collections Summaries for June 2005, June 2006, June 2007, June 2008 & Dec. 2008, available at http://www.tennessee.gov/revenue/statistics/archives.htm#summariesarch. The total amount of collections over the first four years of the tax's existence was, therefore, just over $5 million.[21] Of this $5 million in total collections, $3,070.67, or 0.06%, came from the voluntary purchase of tax stamps. Id. The remaining 99.94% of collections came about after law enforcement agencies seized unauthorized substances and the Department of Revenue subsequently levied assessments, penalties and interest. Id.

**Analysis**

Some initial commentary is in order before we begin our analysis. The use, possession, and sale of illegal drugs place an enormous burden upon our state and nation. The Office of National Drug Control Policy estimated that between 1988 and 2000, Americans spent between $54 billion and $154 billion annually on illicit drugs.[22] In an effort to deter crime, our General Assembly has prescribed lengthy sentences and hefty fines for individuals convicted of manufacturing, delivering, or selling illegal drugs, or possessing illegal drugs for the purpose of manufacture, delivery, or sale. Tenn. Code Ann. § 39-17-417(b)-(j) (2006 & Supp. 2008). For example, the possession of 300 or more grams of cocaine with the intent to sell is a Class A felony with a fine of up to $500,000. Tenn. Code Ann. § 39-17-417(j)(5). The possession of twenty-six grams or more of cocaine with the intent to sell is a Class B felony, subjecting the offender to a fine of up to $200,000. Tenn. Code Ann. § 39-17-417(I). The possession of 0.5 grams or more of cocaine with the intent to sell is a Class B

---

[20] Tennessee's fiscal year begins on July 1 and extends through June 30 of the following year. Because the tax on unauthorized substances became effective on January 1, 2005, the Department of Revenue made collections under the tax for only the last six months of FY 2005.

[21] The fiscal note on the Senate version of the legislation (S.B. 2419) projected that annual collections under the unauthorized substances tax would be approximately $3.6 million. Statement of Sen. McNally, Senate Finance, Ways & Means Committee, Apr. 6, 2004; see also Cruz, Tennessee Targets Dealers, Users with New Levy, The Tennessean, Dec. 29, 2004, at 1A.

[22] Office of National Drug Control Policy, What America's Users Spend on Illegal Drugs: 1988-2000, at 3 (Dec. 2001), available at http://www.whitehousedrugpolicy.gov/publications/pdf/american_users_spend_2002.pdf.

felony with a fine of as much as $100,000. Tenn. Code Ann. § 39-17-417(c)(1). The cost for jails, prisons, and law enforcement is substantial, and the expense of health care and social services is enormous, but the real tragedy lies in the waste or loss of human life and its inevitably deleterious effect upon family and friends. In this context, our legislature is worthy of commendation for its effort to defray the costs incident to the struggle against illegal drugs. Even under these circumstances, however, it is our duty to dispassionately apply the rule of law in a fair and impartial manner, unswayed by genuine public concerns, partisan interests, or fear of criticism. Tenn. Sup. Ct. R. 10, Canon 3(B)(2).

## I. Federal and State Constitutional Issues

Waters' complaint contested the constitutionality of the unauthorized substances tax in light of the right against self-incrimination, the protection against double jeopardy, and the guarantee of procedural due process. The trial court ruled on each of these issues, but the Court of Appeals did not address them. As a means of avoiding any delay occasioned by further litigation involving the same issues, we will consider these constitutional challenges.

## A. Self-Incrimination

Waters contends that the tax on unauthorized substances violates his right against compelled self-incrimination under the federal and state constitutions. The trial court agreed, holding that the tax "requires that [Waters] expose himself. It requires that he take some action to say in some way that I am in the process or have committed a crime." As indicated, the Court of Appeals did not address the issue.

The Fifth Amendment to the United States Constitution provides, in part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment privilege against self-incrimination applies to the states through the Fourteenth Amendment. State v. Rogers, 188 S.W.3d 593, 605 n.4 (Tenn. 2006) (citing Malloy v. Hogan, 378 U.S. 1, 6 (1964)). The Tennessee Constitution similarly guarantees "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. With regard to self-incrimination, this Court has "traditionally interpreted article I, § 9 to be no broader than the Fifth Amendment." State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997). Both the federal and state provisions "protect the accused from being compelled to provide evidence of a testimonial or communicative nature" that might later be used against him in a criminal case. Id.; see also Fisher v. United States, 425 U.S. 391, 408 (1976); State v. Walton, 41 S.W.3d 75, 87 (Tenn. 2001). Where the evidence is not of a testimonial or communicative nature, the protection against self-incrimination is inapplicable. State v. Cole, 155 S.W.3d 885, 898-99 (Tenn. 2005).

As noted, the United States Supreme Court has previously found certain taxes on illegal activity to violate the Fifth Amendment protection against self-incrimination. In Marchetti, the Court addressed the applicability of the privilege in the context of an extensive registration requirement related to a federal occupational tax on wagering. The statutory scheme required bookmakers to submit a registration form to the Internal Revenue Service ("IRS"), which also served as a tax return, indicating that they were engaged in the business of accepting wagers and including

both their personal information and that of their agents and employees. Marchetti, 390 U.S. at 42. The IRS made this information available to state and federal law enforcement authorities, who regularly used it in criminal prosecutions for gambling offenses. Id. at 47-48. Further, bookmakers were required to post a revenue stamp, which denoted payment of the tax, "'conspicuously' in their principal places of business, or . . . on their persons." Id. at 47.

In Marchetti, the high Court ruled that the "central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." Id. at 53. Although the Court reiterated that the government may generally tax illegal activities, it held that "every portion of [the statutory] requirements" of the tax on wagering "had the direct and unmistakable consequence of incriminating" the individuals who paid the tax. Id. at 49. Because registrants could "reasonably expect that registration and payment of the occupational tax [would] significantly enhance the likelihood of their prosecution for future acts, and [would] readily provide evidence which [would] facilitate their convictions," the registration requirements violated the privilege against self-incrimination. Id. at 54; see also Grosso, 390 U.S. at 65-67.[23] Similarly, in Leary, the Court held that the transfer tax provisions of the Marihuana Tax Act "created a 'real and appreciable' hazard of incrimination" because compliance with those provisions would have required Dr. Leary to identify himself as a member of a "selective group inherently suspect of criminal activities." 395 U.S. at 18.

In reviewing the constitutionality of their states' drug stamp taxes, other state courts have determined that Marchetti created three "criteria for determining the constitutionality of a tax statute challenged on fifth amendment grounds." Sisson v. Triplett, 428 N.W.2d 565, 571 (Minn. 1988); see also Briney v. State Dep't of Revenue, 594 So.2d 120, 122 (Ala. Civ. App. 1991); White v. State, 900 P.2d 982, 988-89 (Okla. Crim. App. 1995); State v. Hall, 557 N.W.2d 778, 784 (Wis. 1997). The three Marchetti "prongs" are as follows:

(1) whether the regulated activity is in an area "permeated with criminal statutes," and the tax aimed at individuals "inherently suspect of criminal activities"[;]

(2) whether an individual is required, under pain of criminal prosecution, to provide information which the individual might reasonably suppose would be available to prosecuting authorities[; and]

---

[23] "Taking its cue from the language" in Marchetti and Grosso, Congress made several changes to the federal tax on wagering in 1974, including: (1) deleting the requirement that registrants conspicuously display their tax stamp or produce it upon demand; (2) no longer requiring local IRS offices to provide wagering tax information to local law enforcement agencies; and (3) enacting specific restrictions upon the disclosure and use of wagering tax information. United States v. Sahadi, 555 F.2d 23, 25 (2d Cir. 1977). "The 1974 revisions of the federal wagering tax laws and the concomitant change in Treasury Department practices . . . eliminated the 'real and appreciable' hazards of self-incrimination that existed under the prior law." United States v. U.S. Currency, 626 F.2d 11, 13 (6th Cir. 1980) (quoting Sahadi, 555 F.2d at 27).

> (3) whether such information would prove a significant link in a chain of evidence
> tending to establish guilt.

Sisson, 428 N.W.2d at 571 (quoting Marchetti, 390 U.S. at 47-48). When applying either these three specific elements or the broader "central standard" of whether compliance with the tax creates substantial and real hazards of incrimination, some state courts have held that the information taxpayers were required to provide under their states' drug stamp taxes violated the privilege against self-incrimination. See, e.g., Fla. Dep't of Revenue v. Herre, 634 So.2d 618, 620 (Fla. 1994) (holding that the confidentiality provisions of the drug tax statute were undermined by a provision allowing the Department of Revenue to release taxpayers' information "to state and federal law enforcement officials as long as those officials present a subpoena"); State v. Roberts, 384 N.W.2d 688, 691 (S.D. 1986) ("We believe the clear import of [the drug stamp tax statute] is to incriminate, and thus the chapter is unconstitutional."); Hall, 557 N.W.2d at 787 (holding that the statute's purchase and affixation requirements both unconstitutionally compelled self-incrimination). Conversely, other courts have upheld state drug stamp taxes in the face of constitutional challenges based on the privilege against self-incrimination after determining that the information obtained by revenue authorities as a result of the payment of the tax (1) was confidential, (2) could not be divulged to the law enforcement authorities, and (3) could not be used in subsequent criminal prosecutions except those for violations of the tax statute itself. See, e.g., Briney, 594 So.2d at 122-23 (observing that the statute contained "nothing less than an absolute exclusionary rule, whereby any information that the Department improperly discloses is inadmissible unless it is obtained from another source"); State v. Durrant, 769 P.2d 1174, 1183 (Kan. 1989); Sisson, 428 N.W.2d at 574 (Minn. 1988); State v. Garza, 496 N.W.2d 448, 455 (Neb. 1993); White, 900 P.2d at 988-91; Zissi v. State Tax Comm'n, 842 P.2d 848, 857 (Utah 1992).

The Tennessee General Assembly included specific language in this state's tax on unauthorized substances in an effort to avoid a process violative of the privilege against self-incrimination. By the terms of the legislation, all information regarding possession of unauthorized substances that is obtained in connection with the voluntary payment of the tax must remain "confidential and, unless independently obtained, may not be used in a criminal prosecution." Tenn. Code Ann. § 67-4-2808 (Supp. 2004).[24] Either disclosure or the improper inspection of tax information by a Department of Revenue employee constitutes a criminal offense. Tenn. Code Ann. §§ 67-1-1709(a), (c) (2006). Finally, "[d]ealers are not required to give their name, address, social security number, or other identifying information on the form" they fill out to request the stamps, and "[t]axes may be paid and stamps may be issued either by mail or in person." Tenn. Code Ann. § 67-4-2805(a). Our comparison of these provisions with those enacted in other states leads us to

---

[24] The trial court expressed concerns about the phrase "unless independently obtained," stating that "the argument that [Waters] can do this and suffer no consequences, unless the information about what he has done is independently obtained, always runs the risk that . . . it's obtained by someone who's not . . . an employee of the state or engaged in law enforcement, but obtained from some private person, perhaps in his own home or a friend or someone in the community, who then reports it." Of note is that the General Assembly removed this exception to the confidentiality requirement in 2007 by deleting the phrase from the statute. 2007 Tenn. Pub. Acts 977 (codified at Tenn. Code Ann. § 67-4-2808 (Supp. 2008)).

-14-

conclude that Tennessee's drug stamp tax is more closely aligned with those statutory provisions that have survived constitutional challenges grounded in the privilege against self-incrimination.

Waters relies upon the Wisconsin Supreme Court's opinion in Hall as support for his contention that Tennessee's tax on unauthorized substances violates his right against self-incrimination. In that case, Wisconsin's highest court held that both the act of purchasing the tax stamps and the requirements that the stamps be affixed to and displayed upon the illegal drugs violated the privilege against self-incrimination. Hall, 557 N.W.2d at 785-87. Wisconsin's law, "on its face, only provide[d] a dealer with protection from direct–not derivative–use of information obtained by the [Department of Revenue] through compliance with the statute.[25] Id. at 787. In our view, Tennessee's tax is different. Most significantly, Wisconsin's taxing statute contained no protections against the disclosure of the taxpayer's information, either to law enforcement officers or in subsequent criminal proceedings unrelated to the payment of the tax. In contrast, the provisions of Tennessee Code Annotated section 67-4-2808 do contain such safeguards. Further, although the Tennessee statute requires that the stamps be affixed, our statute provides that "[s]tamps issued pursuant to this part may not be used in a criminal prosecution other than a prosecution for a violation of this part." Tenn. Code Ann. 67-4-2808. Thus, while a possessor of illegal drugs in Tennessee is required to purchase and affix the revenue stamp, the state may not use the presence of the stamp as evidence in a criminal prosecution for the possession or sale of illegal drugs. Contra Hall, 557 N.W.2d at 786 (characterizing Wisconsin's affixation requirement as "an incriminating testimonial communication that the dealer knowingly and intentionally possesses a particular quantity of unlawful drugs").

In summary, Tennessee's tax on unauthorized substances ensures that the acquisition of drug stamps is anonymous, that any information obtained by the Department of Revenue must remain confidential and cannot be disclosed to law enforcement, and that the possession or use of drug stamps may not be used as part of criminal investigation or prosecution. Thus, the payment of the tax under these circumstances does not create a substantial, real and appreciable hazard of self-incrimination. Moreover, although the tax is aimed at individuals "inherently suspect of criminal activities," the confidentiality provisions of the statute ensure that the information is not to be used in a criminal prosecution, will not be made available to law enforcement or prosecuting authorities, and cannot become a significant link in a chain of evidence tending to establish a violation of the criminal laws prohibiting drug possession and sale. In consequence, the imposition of the tax on

---

[25] Notably, the Wisconsin legislature followed the suggestion of its state's supreme court in Hall and adopted, "almost verbatim," the confidentiality provisions in the drug tax statute of its neighbor, Minnesota. State v. Jones, 651 N.W.2d 305, 315 (Wis. Ct. App. 2002) (citing Hall, 557 N.W.2d at 791; 1997 Wis. Sess. Laws 27, § 2979m, eff. Jan. 1, 1998). The Court of Appeals of Wisconsin subsequently held that the amended language should be construed consistently with the Wisconsin legislature's intent for it to "remedy the compelled self-incrimination problem identified in *Hall*." Jones, 651 N.W.2d at 315. The Idaho legislature likewise added a confidentiality provision to its drug tax statute in order to pass constitutional muster. State v. Smith, 813 P.2d 888, 890 (Idaho 1991) (holding that the amendments of 1990 Idaho Sess. Laws, ch. 179, § 1 cured the self-incrimination deficiencies in the original statute); Harms v. Conway, No. CV06-34-S-LMB, 2007 WL 2265116, at *6 (D. Idaho Aug. 6, 2007) (same).

Waters does not violate his privilege against self-incrimination under either the United States or Tennessee Constitution.

### B. Double Jeopardy

Waters also asserted that Tennessee's tax on unauthorized substances violated state and federal constitutional protections against double jeopardy. At the conclusion of the hearing on the declaratory judgment suit, the trial court determined that the statute imposed a criminal penalty rather than a civil sanction and assessed a tax far in excess of the amount Waters paid for the illegal drugs, both of which are key components in a double jeopardy analysis. Because, however, a jury had not been empaneled in a criminal prosecution, the trial court held that Waters had not yet been exposed to double jeopardy.

Jeopardy attaches when a guilty plea is unconditionally accepted by a trial court. State v. Todd, 654 S.W.2d 379, 383 (Tenn. 1983). Here, Waters entered a guilty plea to the criminal charge on January 29, 2008, well after the assessment of the tax. Because it is undisputed that Waters was eventually exposed to criminal punishment for his misdeeds, however, principles of judicial efficiency suggest that we address the double jeopardy claim.

Both the Fifth Amendment to the United States Constitution and article I, section 10 of the Tennessee Constitution provide that no person shall, "for the same offence . . . be twice put in jeopardy of life or limb." "Three fundamental protections are encompassed in the principle of double jeopardy: '(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense.'" State v. Thompson, __ S.W.3d __, __, 2009 WL 1228309, at *6 (Tenn. 2009) (quoting State v. Denton, 938 S.W.2d at 373, 378 (Tenn. 1996)). As to the third of these protections, the one that might apply in this case, the United States Supreme Court has "long recognized that the Double Jeopardy Clause does not prohibit the imposition of all additional sanctions that could, 'in common parlance,' be described as punishment." Hudson v. United States, 522 U.S. 93, 98-99 (1997) (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 549 (1943)); see also Moore v. Illinois, 55 U.S. 13, 19 (1852). Instead, "[t]he Clause protects only against the imposition of multiple *criminal* punishments for the same offense, and then only when such occurs in successive proceedings." Hudson, 522 U.S. at 99 (internal citations omitted); see also State v. Conley, 639 S.W.2d 435, 436 (Tenn. 1982) ("[N]ot every deprivation visited upon one who violates the state's laws is to be considered 'punishment' for purposes of applying the double jeopardy clause."); Metro. Gov't of Nashville & Davidson County v. Miles, 524 S.W.2d 656, 660 (Tenn. 1975) ("[O]nly actions intended to authorize criminal punishment as distinguished from remedial actions subject the defendant to 'jeopardy.'" (quoting Cushway v. State Bar, 170 S.E.2d 732, 736 (Ga. Ct. App. 1969))).

The key issue for our consideration, therefore, is whether the imposition of the tax on unauthorized substances qualifies as a "civil" or "criminal" penalty. If the latter, Waters could not lawfully have been subjected to a second "prosecution." To answer this question, we will employ two similar and overlapping tests that were developed by the United States Supreme Court and

applied recently to the unauthorized substances tax by our Court of Criminal Appeals. See State v. Shields, No. W2007-01861-CCA-R9-CD, 2008 WL 4491739 (Tenn. Crim. App. Oct. 7, 2008).

The first of these tests is a two-pronged, multi-factored analysis used to determine whether any action by the state is criminal or civil in nature. This determination is, "at least initially, a matter of statutory construction." That is, we must ascertain "whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" Hudson, 522 U.S. at 99 (quoting United States v. Ward, 448 U.S. 242, 248 (1980)). If the legislature intended to establish a criminal punishment, then the inquiry ends, because the punishment qualifies as a criminal penalty for purposes of double jeopardy. If, however, the legislature intended to establish a civil penalty, our duty is to review the statutory scheme to ensure that it is not "so punitive[,] either in purpose or effect," as to turn the intended civil sanction into a criminal punishment. Hudson, 522 U.S. at 99 (quoting Ward, 448 U.S. at 248-49). The following factors guide our consideration:

(1) "[w]hether the sanction involves an affirmative disability or restraint";

(2) "whether it has historically been regarded as a punishment";

(3) "whether it comes into play only on a finding of *scienter*";

(4) "whether its operation will promote the traditional aims of punishment - retribution and deterrence";

(5) "whether the behavior to which it applies is already a crime";

(6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and

(7) "whether it appears excessive in relation to the alternative purpose assigned."

Hudson, 522 U.S. at 99-100 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)); see also Shields, 2008 WL 4491739, at *2. No one of these guideposts should be considered dispositive, "as they 'may often point in different directions.'" Hudson, 522 U.S. at 101 (quoting Kennedy, 372 U.S. at 169). However, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Hudson, 522 U.S. at 100 (quoting Ward, 448 U.S. at 249).[26]

---

[26] The two-pronged Hudson/Kennedy analysis is analogous to the test for determining whether forfeiture constitutes criminal punishment that was set forth in United States v. Ursery, 518 U.S. 267, 288 (1996), and applied under Tennessee law by this Court in Stuart v. State Dep't of Safety, 963 S.W.2d 28, 32-34 (Tenn. 1998).

-17-

Our analysis does not end with our consideration of the Hudson/Kennedy factors.  Our tax on unauthorized substances must be compared with the taxing statute that was at issue in Department of Revenue v. Kurth Ranch, 511 U.S. 767 (1994).  In Kurth Ranch, the United States Supreme Court, for the first time, invalidated a tax statute on the grounds that it abridged the Fifth Amendment right against double jeopardy.  Id. at 780-83.  The Court observed that Montana's Dangerous Drug Tax Act[27] had a "remarkably high" tax rate and was intended, "beyond question," to deter the possession of marijuana.  Id. at 780-81.  The Montana statute also exhibited two "unusual features" that "set [it] apart from most taxes" and, the Court ruled, crossed the line between a civil tax and criminal punishment.  Id. at 781.  First, Montana's drug stamp tax "not only hinge[d] on the commission of a crime," but also was exacted only after the arrest of the taxpayer "for the precise conduct that gives rise to the tax obligation in the first place."  Id.  Second, the tax was imposed "on 'possession' of goods that no longer exist[ed] and that the taxpayer never lawfully possessed."  Id. at 783.  While none of the four features was necessarily dispositive, their combination created a tax that was "a concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of double jeopardy analysis."  Id.

After the Kurth Ranch opinion, several state courts ruled that their state drug stamp taxes, when considered along with the criminal laws prohibiting possession and sale of unauthorized substances, violated double jeopardy principles.  See, e.g., Wilson v. Dep't of Revenue, 662 N.E.2d 415, 419-21 (Ill. 1996); Bryant v. State, 660 N.E.2d 290, 296-97 (Ind. 1995); Comm'r of Revenue v. Mullins, 702 N.E.2d 1, 5-8 (Mass. 1998); Desimone v. State, 996 P.2d 405, 410-11 (Nev. 2000); Brunner v. Collection Div., 945 P.2d 687, 689-91 (Utah 1997).  Other state courts, however, concluded that their tax on illegal drugs did not contain the "unusual features" of the Montana tax and rejected double jeopardy challenges based upon Kurth Ranch.  See, e.g., Milner v. State, 658 So.2d 500, 502 (Ala. Civ. App. 1994); Covelli v. Comm'r of Revenue Servs., 668 A.2d 699, 703-07 (Conn. 1995), vacated, Covelli v. Crystal, 518 U.S. 1031 (1996), aff'd on remand, Covelli v. Comm'r of Revenue Servs., 683 A.2d 737 (Conn. 1996), cert. denied, Covelli v. Crystal, 520 U.S. 1174 (1997); State v. Lange, 531 N.W.2d 108, 116-17 (Iowa 1995); State v. Gulledge, 896 P.2d 378, 389 (Kan. 1995); Commonwealth v. Bird, 979 S.W.2d 915, 917 (Ky. 1998); State v. Stubblefield, 543 N.W.2d 743, 748 (Neb. 1996); State v. Ballenger, 472 S.E.2d 572, 575 (N.C. Ct. App. 1996), aff'd per curiam 481 S.E.2d 84 (N.C. 1997); McMullin v. S.C. Dep't of Revenue and Taxation, 469 S.E.2d 600, 602-03 (S.C. 1996).

The Hudson case, which was decided after Kurth Ranch, overruled United States v. Halper, 490 U.S. 435 (1989), a decision relied upon by the Kurth Ranch majority.  Nevertheless, the Hudson Court reaffirmed the vitality of Kurth Ranch, indicating by footnote that "a *Kennedy*-like test" had been applied in Kurth Ranch before striking down the drug tax as "the functional equivalent of a successive criminal prosecution."  Hudson, 522 U.S. at 102 n.6 (quoting Kurth Ranch, 511 U.S. at 784); see also Shields, 2008 WL 4491739, at *2 n.1.  Moreover, while Hudson dealt with the civil or criminal nature of state actions in general, Kurth Ranch considered the propriety of the very type of law–a state drug stamp tax–that is at issue here.  We will, therefore, consider both whether

---

[27] Mont. Code Ann. §§ 15-25-101 to -123 (repealed by 1995 Mont. Laws § 74, ch. 18; § 4, ch. 446).

Tennessee's tax on unauthorized substances is a civil sanction rather than a criminal penalty under the Hudson/Kennedy factors and whether the tax is sufficiently distinguishable from the Montana drug stamp tax that the Supreme Court invalidated in Kurth Ranch.

## 1. Hudson/Kennedy Analysis

As stated, under Hudson, the threshold inquiry is whether our General Assembly characterized the tax on unauthorized substances as civil rather than criminal in nature. In our view, the statute passes this qualifying standard. Initially, the terms of Tennessee Code Annotated section 67-4-2801 specifically provide that the purpose of the taxing statute is "to generate revenue for state and local law enforcement agencies for use by those agencies to investigate, combat, prevent and reduce drug crimes, and for the general fund." Secondly, the tax is payable within forty-eight hours of the acquisition of the unauthorized substance, whether actual or constructive. Tenn. Code Ann. § 67-4-2806. Thirdly, the legislation includes a statement that the enforcement of the tax shall not interfere with criminal prosecutions. See Tenn. Code Ann. § 67-4-2801 ("Nothing in this part may in any manner provide immunity from criminal prosecution for a person who possesses an illegal substance."); Tenn. Code Ann. § 67-4-2810 (2006) ("The provisions of this part shall not be construed to confer any immunity from criminal prosecution or conviction for a violation of title 39, chapter 17, part 4, upon any person who voluntarily pays the tax imposed by this part or who otherwise complies with the provisions of this part."). Finally, the legislative history buttresses the plain language of the statute by indicating that the General Assembly intended to create a civil sanction.[28]

Next, we shall consider each of the seven Hudson/Kennedy guideposts. The first two factors are related: "[w]hether the sanction involves an affirmative disability or restraint" and "whether it has historically been regarded as a punishment." From a historical perspective, money penalties have not been viewed as punishment. Hudson, 522 U.S. at 104 (citing Helvering v. Mitchell, 303 U.S. 391, 400 (1938)). "[A]ffirmative disability or restraint," in the ordinary use of the term, is something akin to "the 'infamous punishment' of imprisonment." Hudson, 522 U.S. at 104 (quoting Flemming v. Nestor, 363 U.S. 603, 617 (1960)). As our Court of Criminal Appeals has concluded, "[p]ayment of a tax bears little resemblance to the deprivation of one's liberty when incarcerated." Shields, 2008 WL 4491739, at *3. The first two factors, therefore, weigh in favor of the tax being classified as a civil remedy rather than a criminal penalty.

The third factor is whether the tax on unauthorized substances comes into play only on a finding of *scienter*, or knowledge of wrongdoing. If so, the legislation is more likely to implicate double jeopardy principles. Tennessee's taxing statute does not contain a *scienter* requirement. To the contrary, it imposes strict liability on "dealers," who are defined only in terms of their possession

---

[28] In response to a query from Representative Bob McKee (R-Niota) as to whether the proposed tax on unauthorized substances "just adds another level of punishment," Rep. Curtiss responded that the tax would be "going at them from the civil side . . . ." Statement of Rep. Curtiss, House Finance, Ways & Means Committee, May 18, 2004.

of certain specified amounts of unauthorized substances. Tenn. Code Ann. § 67-4-2801. This supports a finding that the tax qualifies as a civil sanction.[29]

The fourth Hudson/Kennedy guidepost addresses whether the operation of the tax on unauthorized substances "will promote the traditional aims of punishment," namely retribution and deterrence. This presents a more difficult question for this Court. On one hand, the stated purpose of the tax is to generate revenue for state and local law enforcement agencies in order to reduce the costs of combating illegal drugs. Tenn. Code Ann. § 67-4-2801. This would suggest that the purpose of the tax is neither deterrence nor retribution. On the other hand, deterrence is "[t]he act or process of discouraging certain behavior, particularly by fear," Black's Law Dictionary 481 (8th ed. 2004), and by this definition, the imposition of tax on unauthorized substances has a deterrent purpose on the possession of those substances that is similar to that of other "sin taxes" that governments enact.[30] Importantly, however, the Supreme Court has expressly indicated that "deterrence 'may serve civil as well as criminal goals.'" Hudson, 522 U.S. at 105 (quoting Ursery, 518 U.S. at 292). Based upon this directive, we believe that the fourth factor is either neutral or mildly retributive, which would suggest a purpose more criminal in nature in the double jeopardy analysis.

Because possession of the amount of the controlled substances prescribed in Tennessee Code Annotated section 67-4-2802(3) is a crime in Tennessee, the fifth factor is more clearly an indication that the taxing statute imposes a criminal penalty. Of course, the United States Supreme Court held in Hudson that the fact that the conduct for which money penalties and debarment sanctions were imposed was already a crime was "insufficient to render [them] criminally punitive particularly in the double jeopardy context." 522 U.S. at 105 (citations omitted). Even though both the fourth and fifth factors were suggestive of a criminal penalty in Hudson, the Court nevertheless concluded that "there simply [was] very little showing, to say nothing of the 'clearest proof' required by *Ward*," that the penalties and sanctions in question were more criminal than civil, thereby implicating double jeopardy. Id.

The sixth factor considers whether there exists an alternative purpose to which the tax on unauthorized substances may rationally be connected. We have already observed that the tax is both

---

[29] The dissent's proposed construction of the taxing statute would attach an inference of *scienter*–an intent to sell or distribute controlled substances–to the possession of certain quantities of those substances. Such a reading would suggest that the tax is more a criminal punishment than a civil penalty, at least with regard to this third factor of the Hudson/Kennedy test.

[30] See, e.g., Samantha K. Graff, State Taxation of Online Tobacco Sales: Circumventing the Archaic Bright Line Penned By Quill, 58 Fla. L. Rev. 375, 379 (2006) (noting that sin taxes "deter buyers from indulging in harmful products by making those products more expensive to obtain"); Eduardo Moisés Peñalver, Regulatory Takings, 104 Colum. L. Rev. 2182, 2203 n.94 (2004) ("Because the activities covered by sin taxes are typically frowned upon (often, though not always, because of their perceived harmful effects), sin taxes are often aimed as much at discouraging the targeted behavior by making it more expensive as they are at raising revenue."); see also Kurth Ranch, 511 U.S. at 791 (Rehnquist, C.J., dissenting) (arguing that "[w]hen compared to similar types of 'sin' taxes on items such as alcohol and cigarettes," the Montana drug stamp tax was not "so high that it can only be explained as serving a punitive purpose").

a civil taxing measure contributing to the general revenue fund and a civil remedial measure designed to mitigate against the enormous costs of law enforcement related to drug control for state and local government. In fact, these dual purposes appear to be the driving forces behind the tax. When a law enforcement agency conducts an investigation that leads to a tax assessment, the agency receives 75% of the revenue regardless of whether any criminal charges are filed. The remaining 25% becomes a part of the State's general fund. Tenn. Code Ann. § 67-4-2809(b)(2). All of the funds voluntarily paid under Tennessee's tax on unauthorized substances go directly into the general fund. Tenn. Code Ann. § 67-4-2809(c). Because the generation of revenue is a legitimate, alternative purpose, this sixth factor weighs in favor of the tax being classified as civil in nature.

The seventh and final Hudson/Kennedy guidepost is whether the tax on unauthorized substances appears excessive in relation to the civil purpose assigned to it. Waters asserts that the tax is excessive because he paid $12,000 for the kilogram of cocaine and was then assessed with a tax, penalties and interest totaling over $55,000. The trial court agreed, holding that the tax was "an attempt to force him to pay an amount of money . . . far in excess of value of the item that he obtained, . . . a kilo of cocaine, for which he paid $12,000."

Initially, the amount of that Waters paid for the cocaine, $12,000, was not the "value of the item that he obtained." The unrefuted testimony at the hearing established the street value for the cocaine at approximately $100 per gram. The "retail" market value of the kilogram of cocaine, then, approximated $100,000.[31]  Thus, the tax rate of $50 per gram set by section 67-4-2803(a)(4) translates to approximately 50% of the market value of the product.

In our view, a tax of $50 per gram of cocaine is not excessive when compared to its civil purpose – generating revenue to fund the drug control efforts of law enforcement. In her dissenting opinion in Kurth Ranch, Justice O'Connor wrote that "[t]he State and Federal Governments spend vast sums on drug control activities," and that the state "has a legitimate nonpunitive interest in defraying the costs of such activities." 511 U.S. at 794 (O'Connor, J., dissenting). Governmental expenditures for drug control at the time of Kurth Ranch were significant. Id. (observing that the Bureau of Justice Statistics at the United States Department of Justice estimated that approximately $27 billion was spent on drug control in 1991). Today, we can safely speculate that law enforcement costs attributable to drug control are even greater.[32]  Given the enormity of these costs, Waters has

---

[31] The wholesale price of powder cocaine in December 2006 in Knoxville was between $20,000 and $24,000 per kilogram, or $20 to $24 per gram. U.S. Dep't of Justice, National Illicit Drug Prices: December 2006, Table 3: Powder Cocaine, at 10 (Feb. 2007), available at http://www.methadonesupport.org/DrugPrices.pdf. This wholesale value is approximately double the price of $12,000, or $12 per gram, that Waters paid for the drugs.

[32] For example, the federal executive branch has requested over $15 billion to support its National Drug Control Strategy in FY 2010, approximately $3.5 billion of which is targeted towards domestic law enforcement. These figures represent an increase from the final budget of $13.3 billion for the entire program and $3.5 billion for domestic law enforcement in FY 2008. Office of National Drug Control Policy, National Drug Control Strategy: FY 2010 Budget Summary, Table 1: Federal Drug Control Spending by Function, available at

(continued...)

failed to clearly establish that the amount of the tax on unauthorized substances is excessive. Thus, the seventh factor weighs in favor of the classification of the legislation as a civil remedy.

Having considered the Hudson/Kennedy guideposts, we have determined that five of the factors weigh in favor of the tax on unauthorized substances being classified as a civil sanction, one factor weighs toward the tax being a criminal penalty, and one factor is either neutral or marginally on the side of the statute qualifying as a criminal penalty. As the Court of Criminal Appeals ruled in Shields, we hold "that the legislative intent that the tax is civil rather than criminal in nature has not been overcome by . . . 'the clearest proof,'" as is required under law. 2008 WL 4491739, at *7. By application of the Hudson/Kennedy standard, Tennessee's tax on unauthorized substances does not, therefore, qualify as a criminal punishment.

## 2. **Kurth Ranch** Analysis

We now turn to whether Tennessee's tax on unauthorized substances is sufficiently distinguishable from the Montana tax that the Supreme Court invalidated in Kurth Ranch. If our taxing statute contains the "unusual features" present in the Montana tax, then the assessment qualifies as criminal for double jeopardy purposes.

In Kurth Ranch, the Supreme Court observed that Montana had enacted a rate of taxation of more than 400% of the market value of marijuana and 800% of the value of "shake" (the stems, leaves, and other loose parts of the marijuana plant). 511 U.S. at 774 & n.12, 780 & n.17. It characterized the tax rate as "remarkably high" and as "unrivaled" by any other jurisdiction. Id. at

---

[32](...continued)

http://www.whitehousedrugpolicy.gov/publications/policy/10budget/index.html (last visited June 9, 2009). In FY2006, total federal criminal justice expenditures exceeded $36 billion. That amount was dwarfed by state and local spending on law enforcement in 2006, which was approximately $69 billion and $104 billion, respectively. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Direct Expenditure by Level of Government, 1982-2006, available at http://www.ojp.usdoj.gov/bjs/glance/tables/expgovtab.htm (last visited June 9, 2009).

The State of Tennessee and its local communities have not been immune from these high costs. In 2000, the expenditures of the Tennessee Department of Safety were nearly $140 million. In addition, the combined expenditures of the Shelby County Sheriff's Department and Memphis Police Department exceeded $233 million, the expenditures of the Nashville/Davidson County Metropolitan Police Department exceeded $101 million, the combined expenditures of the Knox County Sheriff's Department and Knoxville Police Department exceeded $50 million, and the combined expenditures of the Hamilton County Sheriff's Department and Chattanooga Police Department were nearly $47 million. Brian A. Reaves & Matthew J. Hickman, Bureau of Justice Statistics, Law Enforcement Management and Administrative Statistics, 2000: Data for Individual State and Local Agencies with 100 or More Officers 58-59, 245 (2004), available at http://www.ojp.usdoj.gov/bjs/pub/pdf/lema002a.pdf and http://www.ojp.usdoj.gov/bjs/pub/pdf/lema002b.pdf. "State and local government expenditures for drug enforcement are substantial but more difficult to determine with precision." Juan R. Torruella, The "War on Drugs": One Judge's Attempt at a Rational Discussion, 14 Yale J. on Reg. 235, 242 (1997).

As noted, the total amount of revenues from the tax on unauthorized substances over the first four years of the tax's existence was just over $5 million.

780 & n.17. The Court also found it to be "beyond question" "[t]hat the Montana Legislature intended the tax to deter people from possessing marijuana." Id. at 780.

Of note is that the 50% tax rate on cocaine imposed by our legislation is far less than the rates of taxation considered by the high court in Kurth Ranch. Further, as we have observed, the Tennessee General Assembly passed the tax on unauthorized substances, at least in part, to deter the possession of illegal drugs. We do not find these facts to be dispositive, however, because the Court expressly indicated that "neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax as a form of punishment." In fact, "many taxes that are presumed valid, such as taxes on cigarettes and alcohol, are also both high [in amount] and motivated to some extent by an interest in deterrence."[33] Id. at 780-81. "Thus, while a high tax rate and deterrent purpose lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive." Id. at 781.

The two "unusual features" that led the Court to invalidate the Montana Dangerous Drug Tax as violative of the right against double jeopardy are of even greater significance that the rate of taxation or any deterrent purposes. First, the Montana tax "not only hinge[d] on the commission of a crime," but also was "exacted only after the taxpayer ha[d] been arrested for the precise conduct that g[ave] rise to the tax obligation in the first place." Kurth Ranch, 511 U.S. at 781. That is, the Montana taxpayer had "no obligation to file a return or pay any tax unless and until he [was] arrested," id. at 771, meaning that those "arrested for possessing marijuana constitute[d] the entire class of taxpayers subject to the Montana tax." Id. at 782. The second "unusual feature" of the Montana tax was that it only applied to drugs that had been seized after an arrest. In consequence, the tax was levied only upon goods that the taxpayer neither owned nor possessed at the time it was imposed. Id. at 783. The Court observed that "[a] tax on 'possession' of goods that no longer exist and that the taxpayer never lawfully possessed has an unmistakable punitive character." Id. The Court also found it "curious" that one of the two alternative measures of the Montana tax was the market value of marijuana, a substance that, of course, could not be lawfully sold. Id. at 783 n.23.

---

[33] By way of comparison, Tennessee raised its state excise tax on cigarettes from $0.20 to $0.62 per pack effective July 1, 2007. 2007 Tenn. Pub. Acts 488-89. Considering all such state taxes as of July 1, 2009, Tennessee's tax ranks thirty-ninth among the fifty states and the District of Columbia, and is less than half of the average state excise tax of $1.27 per pack. Campaign for Tobacco-Free Kids, State Cigarette Excise Tax Rates & Rankings (updated May 28, 2009), available at http://www.tobaccofreekids.org/research/factsheets/index.php?CategoryID=18. The average retail price per pack of cigarettes in Tennessee with all taxes included, including the $1.01 per pack federal tax, is $4.36. Campaign for Tobacco-Free Kids, State Excise and Sales Taxes Per Pack of Cigarettes: Total Amounts and State Rankings (updated May 28, 2009), available at http://www.tobaccofreekids.org/research/factsheets/index.php?CategoryID=18. Thus, even Tennessee's comparatively small cigarette excise tax amounts to over 14% of the average retail price per pack. When one takes into account the Tennessee sales tax of 8.5%, which also applies to cigarettes, see id., state taxes are responsible for 22% of the average retail price per pack of cigarettes in Tennessee.

Because Tennessee's tax on unauthorized substances was modeled after the drug stamp tax in our neighboring state of North Carolina,[34] that state's experience with its statute in the wake of Kurth Ranch is particularly instructive. The North Carolina drug stamp tax was first enacted in 1989. The Fourth Circuit Court of Appeals, invoking Kurth Ranch, held that the original version of North Carolina's drug tax statute was a criminal penalty rather than a civil tax. Lynn v. West, 134 F.3d 582, 589-93 (4th Cir. 1998), cert. denied 525 U.S. 813 (1998).[35] The tax has since been amended three times.[36] Moreover, North Carolina's courts have distinguished their state's drug stamp tax from the Montana tax invalidated in Kurth Ranch:

> The North Carolina Controlled Substance Tax, as it was in effect at all times pertinent to this case . . . contains neither of the "unusual features" upon which the Supreme Court relied in Kurth Ranch to conclude that Montana's dangerous drug tax constituted punishment for double jeopardy purposes. The North Carolina Controlled Substance Tax is not predicated upon whether the taxpayer in possession of the controlled substance has been arrested or charged with criminal conduct, nor is it assessed on property that necessarily has been confiscated or destroyed. . . . The tax obligation is not contingent upon the dealer's arrest which, in the normal course of events, would result in the confiscation and destruction of the substance. The dealer can satisfy his tax obligation by paying the tax upon acquisition of the substance and by then permanently affixing thereto stamps issued by the Secretary of Revenue to indicate payment. So long as the stamps remain affixed, no additional tax is thereafter due even though the substance may be handled by other dealers. Because the North Carolina tax becomes payable within forty-eight hours after the taxpayer comes into possession of the substance, it is not a tax on confiscated goods,

---

[34] Supra note 19; Bonna de la Cruz, Tennessee Targets Dealers, Users with New Levy, The Tennessean, Dec. 29, 2004, at 1A.

[35] Lynn addressed North Carolina's drug stamp tax in the context of a suit claiming a deprivation of civil rights under 42 U.S.C. § 1983. 134 F.3d at 583-84. The Fourth Circuit's ultimate holding was that because North Carolina's drug tax is a criminal penalty, all proceedings to enforce it must include the constitutional safeguards that attach to criminal proceedings. Id. at 593.

[36] N.C. Gen. Stat. §§ 105-113.105 to .113 (as amended by 1995 N.C. Sess. Laws, ch. 340, § 1, eff. Oct.1, 1995; 1997 N.C. Sess. Laws ch. 292, § 1, eff. Oct. 1, 1997; 1998 N.C. Sess. Laws ch. 218, eff. Oct. 31, 1998). The North Carolina General Assembly designed amendments to the statute in both 1995 and 1998 specifically to address the concerns of the Supreme Court and the Fourth Circuit and to make the statute less punitive for double jeopardy purposes. The preamble to the 1998 amendments to the law states, in part:

> Whereas, upon further challenge in the federal courts, the controlled substance tax was found in 1998 to be a criminal penalty, and the United States Supreme Court let the federal ruling stand . . . it is, therefore, the intent of the North Carolina General Assembly to modify the tax in accordance with the recent federal court ruling, so that the tax may continue to be assessed in a manner consistent with the law as interpreted by the federal courts.

N.C. Sess. Laws 1998-218.

as was the case with the Montana tax, which became due only upon the taxpayer's arrest for possession of the substance. . . .

\*    \*    \*

We hold that the North Carolina Controlled Substance Tax does not have such fundamentally punitive characteristics as to render it violative of the prohibition against multiple punishments for the same offense contained in the Double Jeopardy Clause.

Ballenger, 472 S.E.2d at 574-75 (emphasis added) (internal citations omitted); see also Shields, 2008 WL 4491739, at \*6 (discussing the interpretation of the North Carolina tax). Subsequent opinions have reaffirmed Ballenger and indicated that the Fourth Circuit's characterization of the North Carolina drug stamp tax as a criminal penalty is not binding on their state's courts.[37] Most recently, a federal district court held that the amended North Carolina statute is a civil tax, not a criminal penalty. Hough v. Mozingo, No. 1:04 CV 609, 2005 WL 1168462, at \*7-8 (M.D.N.C. Apr. 29, 2005); see also Nivens v. Gilchrist, 319 F.3d 151, 155-58 (4th Cir. 2003) (discussing at length the amendments to North Carolina's drug stamp tax and holding that Lynn was not controlling in a case involving the post-1995 version of the tax).

The unauthorized substances tax in Tennessee contains the same provisions that have distinguished the North Carolina drug stamp tax from the invalidated Montana tax. Like the North Carolina law, those "dealers" in Tennessee who acquire actual or constructive possession of an unauthorized substance on which taxes have not been paid are required to purchase tax stamps from the Department of Revenue within forty-eight hours and permanently affix those stamps to the unauthorized substances in their possession. Compare Tenn. Code Ann. § 67-4-2806 with N.C. Gen. Stat. § 105-113.109. Thus, unlike the Montana tax, Tennessee's statutory scheme requires prompt payment of the tax upon coming into possession of the unauthorized substance. Tennessee's tax, therefore, is not contingent on an arrest. To the contrary, a "dealer" owes the tax even if he or she is never arrested.[38] In fact, the Department of Revenue may assess the tax even if no criminal

_____

[37] N.C. Sch. Bds. Ass'n v. Moore, 614 S.E.2d 504, 515-16 (N.C. 2005) (reaffirming Ballenger); State v. Creason, 473 S.E.2d 771, 772 (N.C. Ct. App. 1996), aff'd per curiam 484 S.E.2d 525 (N.C. 1997) (same); State v. Adams, 513 S.E.2d 588, 589 (N.C. Ct. App. 1999) (affirming Ballenger and Creason in light of the Fourth Circuit's decision in Lynn, which is not binding on North Carolina state courts); Milligan v. State, 522 S.E.2d 330, 331-32 & n.2 (N.C. Ct. App. 1999) (reiterating that the drug tax is not a criminal penalty and Lynn is not binding).

[38] The legislative history establishes that the bill's sponsors did not anticipate that many drug dealers would pay the tax ahead of arrest and prosecution. Moreover, Department of Revenue statistics reveal that only a very small fraction of collections stem from the voluntary purchase of drug stamps. However, the fact that "many dealers refuse to pay the tax does not transform the tax into one assessed only upon criminal prosecution." Simpson v. Bouker, 249 F.3d 1204, 1211 (10th Cir. 2001) (addressing Kansas's drug stamp tax in the context of a petition for writ of habeas corpus and holding that State v. Jensen, 915 P.2d 109 (Kan. 1996), which upheld the tax in light of Kurth Ranch, was also consistent with the analysis in Hudson). "The practicalities surrounding the imposition of the tax . . . merely reflect

(continued...)

prosecution is forthcoming.[39]  Furthermore, Tennessee's tax on unauthorized substances does not apply, as the Montana tax did, only to items that have already been seized and are no longer in the taxpayer's possession.  Instead, the tax is imposed upon dealers who are in possession of more than a certain specified amount of an unauthorized substance, regardless of whether that substance has been seized.  See Tenn. Code Ann. § 67-4-2803.  The amounts prescribed under section 67-4-2803 also are not based, as Montana's tax on marijuana was in part, on the "market value" of those illegal substances.  In short, our statute taxing unauthorized substances contains neither of the "unusual features" that were present in the Montana drug stamp tax considered in Kurth Ranch.  It may, therefore, be properly classified as a civil measure rather than a criminal punishment.

After careful consideration of the tests set forth by the United States Supreme Court in both Hudson and Kurth Ranch, our conclusion is that Tennessee's tax on unauthorized substances is not a criminal punishment for purposes of the double jeopardy clause of the federal and state constitutions.[40]  The trial court's conclusion that the tax is a criminal penalty was erroneous.  Thus, Waters' plea of guilty to the criminal charges against him, which occurred subsequent to the imposition of the tax by the Department of Revenue, did not implicate double jeopardy principles.

### C. Procedural Due Process
 Because Waters' assets were "seized without notice or opportunity to object," the trial court held that the Department of Revenue's procedures for assessment and collection of the tax on unauthorized substances failed to satisfy the procedural due process requirements of the state and federal constitutions.  Our next consideration, therefore, is whether the Department of Revenue's procedure violates the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution.  Initially, because the taxing statute qualifies as civil in nature rather than criminal, the enforcement of the tax does not trigger the constitutional safeguards that accompany criminal proceedings.  Contra Lynn, 134 F.3d at 593.  In consequence, we will consider only whether the tax meets the procedural due process requirements for a civil tax.

In proceedings challenging the imposition of a tax, the government must allow the taxpayer to be heard in a meaningful way.  Specifically, "[t]o satisfy the requirements of the Due Process Clause . . . the State must provide taxpayers with, not only a fair opportunity to challenge the

---

[38](...continued)
the reality of attempting to tax an illegal activity.  The taxpayer's voluntary choice to ignore his or her tax obligations should not be the determinative factor in evaluating whether [the] tax constitutes punishment in the double jeopardy context."  Covelli, 668 A.2d at 706.  But see Lynn, 134 F.3d at 591 ("The theoretical possibility that a drug dealer could voluntarily pay the Drug Tax does not take the tax out of the criminal penalty category.").

[39] During the legislative debate, Representative Tommy Head (D-Clarksville) stated that "it is a possibility that you cannot convict someone of a drug offense but can collect the tax."  Statement of Rep. Head, House Finance, Ways & Means Committee, May 18, 2004.

[40] Our holding also disposes of any substantive due process claim that Waters has made based upon the tax being a criminal punishment rather than a civil remedy.

accuracy and legal validity of their tax obligation, but also a 'clear and certain remedy' for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one." McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, 496 U.S. 18, 39 (1990) (quoting Atchison, Topeka & Santa Fe Ry. Co. v. O'Connor, 223 U.S. 280, 285 (1912)) (footnotes omitted). This opportunity to contest, however, need not precede the assessment and collection of the tax:

> [I]t is well established that a State need not provide predeprivation process for the exaction of taxes. Allowing taxpayers to litigate their tax liabilities prior to payment might threaten a government's financial security, both by creating unpredictable interim revenue shortfalls against which the State cannot easily prepare, and by making the ultimate collection of validly imposed taxes more difficult.

McKesson, 496 U.S. at 37; accord Harper v. Va. Dep't of Taxation, 509 U.S. 86, 100-01 (1993). This Court has applied similar principles, holding that

> the state has the power to assess taxes and fix methods for the collection thereof, and it does not matter if these remedies be summary in their nature, so long as the taxpayer is in some way, at some stage of the proceedings, given an opportunity to be heard and have his rights determined before some competent tribunal.

E. Tenn. Brewing Co. v. Currier, 150 S.W. 541, 544 (Tenn. 1912).

The tax on unauthorized substances is assessed in the same manner as other taxes in Tennessee, and dealers may seek review of an assessment for possession of unauthorized substances as provided in Tennessee Code Annotated section 67-1-1801, et seq. Tenn. Code Ann. § 67-4-2807. "[I]f the taxpayer against whom the assessment is made believes the assessment to be unjust, illegal or incorrect," his remedies are to either "pay the tax and file a claim for refund of the tax" or "file suit against the commissioner . . . challenging all or any portion of the assessment of such tax, including any interest and penalty associated with the tax." Tenn. Code Ann. § 67-1-1801(a)(1)(A)-(B). Because he presented a facial challenge to the constitutionality of the tax on unauthorized substances, Waters also had the option, which he exercised, of filing a declaratory judgment action in the chancery court. Colonial Pipeline, 263 S.W.3d at 840.

Waters does not dispute the State's argument that the process for challenging an assessment under Tennessee Code Annotated sections 67-4-2807 and 67-1-1801 complies with the due process requirements outlined in McKesson, East Tennessee Brewing Co., and their progeny. To the contrary, his procedural due process argument relies entirely on a holding that the the tax constitutes a criminal penalty. Having already rejected the foundation for his argument, we hold that the statutory procedure for appealing an imposition of the tax on unauthorized substances does not violate the due process clauses of the federal and state constitutions.

While we have concluded that the tax on unauthorized substances does not violate Waters' rights against self-incrimination and double jeopardy and is otherwise compliant with procedural due process, this does not fully resolve the question of constitutionality. We must also determine, as the Court of Appeals did, whether the tax exceeds the General Assembly's taxing power under article II, section 28 of the Tennessee Constitution.

## II. The General Assembly's Taxing Power Under Article II, Section 28

The power to tax belongs to the State in its sovereign capacity, and the exercise of the taxing power is exclusive to the legislature. Waterhouse v. Bd. of President & Dirs. of Cleveland Pub. Schs., 68 Tenn. 398, 400 (1876); see also Sears, Roebuck & Co. v. Woods, 708 S.W.2d 374, 383 (Tenn. 1986); Bank of Commerce & Trust Co. v. Senter, 260 S.W. 144, 146 (Tenn. 1924). Because taxes produce the revenue by which the government operates, the legislature has wide discretion in the adoption of tax measures, and its judgment must be accorded great respect. Genesco, Inc. v. Woods, 578 S.W.2d 639, 641 (Tenn. 1979), superseded on other grounds by 1980 Tenn. Pub. Acts 1278 (codified at Tenn. Code Ann. § 67-1-801(a)(2) (2006)); see also Vertrees v. State Bd. of Elections, 214 S.W. 737, 740 (Tenn. 1919) ("[A] constitutional limitation upon the power of taxation will never be inferred or implied. . . . [T]he legislative power in this respect can only be restrained by a distinct and positive expression in the fundamental law."). The legislature's power to tax, however, is not altogether unrestrained, as courts may invalidate a tax statute if it runs afoul of the federal or state constitution. Sears, Roebuck & Co., 708 S.W.2d at 383; Evans v. McCabe, 52 S.W.2d 159, 160 (Tenn. 1932).

## A. History of Article II, Section 28

Before determining whether the tax on unauthorized substances is a valid exercise of the General Assembly's taxing power, we must first review the history and scope of the power granted by article II, section 28 of the Tennessee Constitution, and specifically the provision in that section pertaining to merchants, peddlers, and privileges:

> The Legislature shall have power to tax merchants, peddlers, and privileges, in such manner as they may from time to time direct, and the Legislature may levy a gross receipts tax on merchants and businesses in lieu of ad valorem taxes on the inventories of merchandise held by such merchants and businesses for sale or exchange. The portion of a Merchant's Capital used in the purchase[41] of merchandise sold by him to non-residents and sent beyond the State, shall not be taxed at a rate higher than the ad valorem tax on property.

Tenn. Const. art. II, § 28. This language finds its origin in the earliest days of our statehood, when the legislature first perceived commerce as a potential source of revenue. In 1803, the General Assembly imposed a tax upon, inter alia, "retail stores, pedlers and hawkers within this state." 1803 Tenn. Pub. Acts 28. Before selling "any article of merchandize," these taxpayers were required to

---

[41] The version of article II, section 28 that appears in the 2007 Replacement of the Tennessee Code Annotated erroneously substitutes the word "purpose" for the word "purchase."

pay twenty-five dollars for a one-year license to the clerk of the county in which they were doing business. Id. at 28-29. In 1819, the General Assembly increased the license tax on "any hawker or pedlar" to fifty dollars and determined that they should pay the same fifty-dollar tax for each wagon or carriage they used in their business.[42] 1819 Tenn. Pub. Acts 61-62.

By the beginning of the 1830s, controversy over taxation was brewing in Tennessee. Article I, section 26 of the Tennessee Constitution of 1796 required land to be taxed in a uniform manner based on acreage.[43] As a result, productive and fertile farmland could be taxed at no higher rate than non-arable land. The Constitutional Convention of 1834 fundamentally altered the structure of taxation in Tennessee. Specifically, article II, section 28 of the Tennessee Constitution of 1834 provides as follows:

> All lands liable to taxation, held by deed, grant, or entry, town lots, bank stock, slaves between the ages of twelve and fifty years, and such other property as the Legislature may from time to time deem expedient, shall be taxable. All property shall be taxed according to its value; that value to be ascertained in such manner as the Legislature shall direct, so that the same shall be equal and uniform throughout the State. No other species of property from which a tax may be collected, shall be taxed higher than any other species of property of equal value. But the Legislature shall have power to tax merchants, pedlars, and privileges, in such manner as they may, from time to time, direct. A tax on white polls shall be laid, in such manner and of such an amount, as may be prescribed by law.

Journal of the Convention of the State of Tennessee, Convened for the Purpose of Revising And Amending the Constitution Thereof 396 (Nashville, W. Hasell Hunt & Co. 1834) ("1834 Convention Journal") (emphasis added). The change to taxation of real property based upon its value, instead of its acreage, was not the only significant modification to Tennessee's approach to taxation in the 1834 Constitution. An amendment offered by John A. McKinney[44] expressly authorizing the legislature to "tax merchants, pedlars, and privileges, in such manner as they may, from time to time, direct" reflected the growing economic diversity in this state.[45] The 1834 Constitution made the

---

[42] Three years later, the General Assembly reduced the tax on peddlers to twenty-five dollars per wagon or carriage. 1822 Tenn. Pub. Acts 10-11.

[43] William Lyons et al., Government and Politics in Tennessee 30 (2001); Robert E. Corlew, Tennessee: A Short History 165 (2d ed. 1990) ("For many years the taxation clause – which provided for equal taxation of all land (except town lots, for which taxes might be as high as those for 200 acres of land) – had been a thorn in the flesh of small farmers who occupied land less valuable than that of others, especially in the valley and basin areas.").

[44] McKinney, a delegate from Hawkins County, was also a driving force in the debate over modifying the taxation of land from acreage-based taxation to value-based taxation. 1834 Convention Journal, at 4; 1 Stanley J. Folmsbee et al., History of Tennessee 302 (1960).

[45] Lewis L. Laska, The Tennessee State Constitution 7 (1990).

"[c]ontinuance of the practice of taxing 'merchants, peddlers, and privileges' . . . permissive,"[46] rather than subject to the requirement elsewhere in the section that property be taxed at an equal rate based upon value.

Although taxation was not one of the driving forces for the Constitutional Convention of 1870, that convention did modify the General Assembly's taxing power in article II, section 28. Several delegates, representing the concerns of commercial interests, aggressively challenged the exemption from the principle of equality in taxation that was embodied in article II, section 28 of the Constitution of 1834. Their concerns are reflected by the arguments of Joseph B. Heiskell:[47]

> We think that the principles of constitutional government require that every class of men shall be entitled to the same protection against oppression and against unequal burthens which are guaranteed to other classes. The provision inserted by the Convention, borrowed from the Constitution of 1834, declares that <u>all men shall be taxed equally except merchants and peddlers</u>. Why they should be singled out and subjected to a rule of taxation absolutely prohibited as to any other citizen, the subscribers cannot well perceive.

<u>Journal of the Proceedings of the Convention of Delegates</u> 300 (Nashville, Jones, Purvis & Co., 1870) ("1870 Convention Journal") (emphasis added). <u>See also</u> <u>Friedman Bros. v. Mathes</u>, 55 Tenn. (8 Heisk.) 488, 493 (1872) ("[T]his proviso was intended as a palpable discrimination against the occupations and classes therein mentioned, and [] the power of taxation as to them, is left to the sound discretion of the legislative department."); <u>Adams v. Mayor of Somerville</u>, 39 Tenn. (2 Head) 363, 365-66 (1859) (noting the key distinction in the 1834 Constitution between taxation of property and taxation of privileges).

The 1870 Convention declined to extend the principle of equality to the taxation of merchants, peddlers, and privileges. <u>See</u> <u>Logan's Supermarkets, Inc. v. Atkins</u>, 304 S.W.2d 628, 630 (Tenn. 1957) (citing cases for the proposition that "the Legislature is not bound by the rule of uniformity prescribed in cases of taxes on property"). It did, however, propose to amend article II, section 28 to address the concerns expressed by Heiskell and others. 1870 Convention Journal, at 369-70. As finally adopted and ratified, article II, section 28 empowered the General Assembly to

> tax Merchants, Peddlers, and privileges, in such manner as they may from time to time direct. The portion of a Merchant's Capital used in the purchase of Merchandise sold by him to non-residents and sent beyond the State, shall not be taxed at a rate higher than the *ad valorem* tax on property.

---

[46] Wallace McClure, <u>State Constitution-Making With Especial Reference to Tennessee</u> 53 (1916).

[47] Heiskell was a delegate from Shelby County. He served as Attorney General and Reporter of Tennessee from 1870 to 1878. Riley C. Darnell, Secretary of State, <u>Tennessee Blue Book 2007-2008</u> 508.

1870 Convention Journal, at 421-22. A mere two years after the Convention of 1870 completed its work, this Court addressed the significance of the amendments to article II, section 28:

> There was in the Convention of 1870, a very energetic opposition to engrafting upon the New Constitution, the clause of the Old Constitution which seemed to operate so harshly and invidiously against the commercial community. We refer to that clause which excludes merchants, peddlers, and privileges, from the protection of the principle of equality. When, however, it was finally adopted, a solemn protest was presented against it by the representatives of large commercial constituencies. And shortly thereafter, the clause now in question was brought forward and adopted. And this was intended as a limitation upon the general power conferred by the Constitution of 1834, and was regarded as a great triumph in behalf of the merchant.

Friedman Bros., 55 Tenn. at 496-97 (emphasis added).

Although article II, section 28 remained unchanged for over one hundred years, it was amended in 1972, 1982 and 2006. The amendment ratified in 1972 slightly altered the language regarding the taxation of merchants, peddlers, and privileges. The Journal and Debates of the Constitutional Convention 854 (1971). As noted, the current version of article II, section 28 explicitly empowers the General Assembly to tax "merchants, peddlers, and privileges, in such manner as they may from time to time direct." In the past, this Court has observed that the inclusion of the phrase "in such manner as they may from time to time direct" reflected the framers' intent to give the General Assembly broad discretion to tax merchants, peddlers, and privileges. Kelly v. Dwyer, 75 Tenn. 180, 188-89 (1881); Friedman Bros., 55 Tenn. at 493; Jenkins v. Ewin, 55 Tenn. (8 Heisk.) 456, 479 (1872). The question presented in this case, of course, is whether the tax on unauthorized substances falls within the legislature's taxing power as defined by our state constitution.[48]

## B. Taxes on Merchants and Peddlers

The Commissioner argues that the Court of Appeals erred by focusing only on a lack of constitutional authority to tax possession of unauthorized substances as a privilege, thereby failing to address the possibility that the General Assembly, by the enactment of the tax, properly exercised its corresponding power to tax merchants and peddlers.[49] The Commissioner equates the statutory definition of "dealers" in Tennessee Code Annotated section 67-4-2802(3) with the "merchants" and

---

[48] Because Tennessee's tax on unauthorized substances was based upon the existing tax in North Carolina, it is worth noting that none of the decisions upholding that tax law address whether it exceeds the North Carolina General Assembly's taxing power under that state's constitution. Neither article II of the North Carolina Constitution, which concerns the powers of legislature, nor article V of that document, which addresses finance and taxes, include the "merchants, peddlers and privileges" provision that is a part of article II, section 28 of the Tennessee Constitution.

[49] The Commissioner raises this argument for the first time in this Court. As noted, the trial court's order was based upon the self-incrimination and due process issues, and the Court of Appeals, without requesting either party to fully brief the article II, section 28 issue, based its decision upon the legislature's power to tax privileges described in that section.

"peddlers" language of article II, section 28 as those terms are commonly defined or have been interpreted by the prior decisions of this Court. He further claims that the legislative purpose was to target those merchants and peddlers who traffic in illicit substances and "ensure that this unfortunately expansive sector of commerce is taxed and thus does not escape the sort of tax burden that is placed on and borne by legitimate commerce."

Indeed, the legislature has an authority to tax merchants and peddlers that is separate and distinct from its power to tax privileges. Article II, section 28 recognizes the legislature's authority to tax merchants, even if those merchants are not exercising a privilege. Jenkins, 55 Tenn. at 474. In Jenkins, this Court made the following observation:

> Upon well settled principles of construing constitutional or statutory provisions, the enumeration of "merchants" and "peddlers" as distinct objects of taxation, would generally be taken as excluding the intention of embracing them under the term "privileges," which is also designated as a distinct subject for taxation. The power to tax "merchants" and "peddlers" is as distinctly recognized by these terms as objects of taxation as in the term "privileges," and the fact that the framers of the Constitution specified merchants and peddlers as distinct objects, would seem to indicate that they did not use the word "privileges" as including in its definition, either "merchants" or "peddlers," but that they intended they might be taxed as merchants and peddlers, and not as privileges.

Id. at 473-74. Later, in Kelly, 75 Tenn. at 189-90, the Court held that a merchant who sells groceries at retail and alcoholic beverages at wholesale may be taxed as a merchant, or for the privilege of having a wholesaler's license to sell alcoholic beverages, or both. The unauthorized substances tax, therefore, falls within the General Assembly's taxing power under article II, section 28 if it can be classified as either a merchants and peddlers tax or a tax on privileges.

Traditionally, merchants and peddlers have been treated as two distinct classes of traders, "the one stationary, the other migratory." State v. Sprinkle, 26 Tenn. (7 Hum.) 36, 39 (1846). A "merchant" is "[o]ne whose business is buying and selling goods for profit." Black's Law Dictionary 1008 (8th ed. 2004). "[I]t seems the business of buying and selling should be the pursuit and avocation of a party, by which he makes his living, in order that he shall be regarded as a merchant." State v. Smith, 24 Tenn. (5 Hum.) 394, 396 (1844); see also Tenn. Club of Memphis v. Dwyer, 79 Tenn. 452, 462 (1883); Simons v. Lovell, 54 Tenn. (7 Heisk.) 510, 517 (1872). Peddlers have an occupation similar to merchants, with the chief difference being that a merchant sells goods at a fixed and permanent place of business, while a peddler has a more itinerant mode of doing business. Sprinkle, 26 Tenn. at 38-39; Greer v. Bumpass, 8 Tenn. (1 Mart. & Yer.) 94, 98 (1827) (describing "the stationary merchant, with merchandise on his shelves" and "the hawker or pedler, with them in his pack"). A peddler is a person who travels from place to place for the purpose of selling his goods. 1819 Tenn. Pub. Acts. 61-62 (referring to "itenerant pedlars"); Swift & Co. v. State, 55 S.W.2d 267, 268 (Tenn. 1932) ("[T]he distinctive feature of peddling is the concurrence of selling and delivering."); Woolman v. State, 32 Tenn. (2 Swan) 353, 354 (1852) ("By the term 'peddler,' we understand one who travels about the country, on foot or in some kind of vehicle, or in any other

-32-

manner, and sells goods or small commodities by retail."); Black's Law Dictionary 1131 (6th ed. 1990).

Given the ordinary meaning of the terms "merchant" and "peddler," we cannot fault the Court of Appeals for failing to consider whether the tax on unauthorized substances is a tax on merchants and peddlers, because such an interpretation runs counter to the taxing statute's definition of "dealer." The legislation defines "dealer" only in terms of actual or constructive possession, and not in terms of the purchase and sale of goods. Tenn. Code Ann. § 67-4-2802(3). Moreover, the statute levies a tax only "on unauthorized substances possessed." Tenn. Code Ann. § 67-4-2803 (emphasis added). The plain language of the statute, therefore, places a tax only upon the control or possession of illegal substances and not upon their transfer or sale. There is no reference in the statute to either the sale of those substances or the intent to sell, whether at a fixed location or in an itinerant capacity. Thus, the term "dealer," as defined by the legislation, does not fall within the traditional meaning of a merchant or a peddler and, therefore, exceeds the broad taxing authority afforded the General Assembly.

We have carefully reviewed the legislative history associated with the passage of the unauthorized substances tax. As suggested by the dissent, some members of the General Assembly did express a desire to impose a tax on illicit drug transactions as opposed to mere possession; however, a cardinal rule of statutory interpretation precludes the consideration of legislative commentary to interpret statutory language when that language is clear and unambiguous. See, e.g., Waldschmidt, 271 S.W.3d at 176. In this instance, the specific terms of the statute levy a tax only upon the possession of the unauthorized substances and not upon a seller or one who possesses with the intent to sell. Moreover, the specific purpose of the statute is to raise revenue for law enforcement, not to tax the illegal drug trade. Unlike the dissent, we do not believe the "pivotal question" in this statutory analysis "is whether among all the individuals possessing a substantial quantity of cocaine there are any individuals who sell, barter, or trade or intend to sell, barter, or trade the cocaine." Instead, the dispositive issue under this section of the Tennessee Constitution is whether there is any credible interpretation of the plain language of the statute that could sustain the tax on possession as a merchants and peddlers tax. Although we are required to make every presumption in favor of the statute's constitutionality, the language employed in section 67-4-2802(3) defining those subject to the tax requires us to answer this question in the negative.

By readily acknowledging that the statute "fails to expressly anticipate that an individual in possession of a large quantity of an unauthorized substance might not be a merchant or peddler of the substance" under article II, section 28, the dissent concedes the conflict between the statute and our state constitution. The dissent would remedy this problem by effectively amending the statute to create a rebuttable presumption that individuals who possess the quantities of unauthorized substances specified in section 67-4-2802(3) do so for purposes of barter, sale or trade. The dissent's rationale is that section 67-4-2807, which permits the taxpayer to seek review of the assessment as provided in Tennessee Code Annotated section 67-1-1801, et seq., requires the taxpayer to either to pay the tax and file a claim for refund or file suit against the Commissioner in chancery court. A showing that the taxpayer merely possessed the unauthorized substances for personal use, the dissent argues, would indicate that the taxpayer is neither a merchant nor a peddler and that the statute is

-33-

unconstitutional as applied. This approach would ignore traditional principles of statutory construction, which prohibit "amendments" to a statute by judicial directive. Under Tennessee Code Annotated section 67-1-1801(a)(1), the objective in a challenge to an assessment is to determine whether it is "unjust, illegal, or incorrect." The dissent's approach would open the door for a slew of as-applied challenges, in which courts would be required to consider whether taxpayers, including those who are clearly in violation of the statute's plain language, should avoid assessment based upon a lack of evidence of either a sale or an intent to sell. In summary, any remedy for the taxing statute's constitutional deficiency is for the legislature, not the judicial branch, to develop.

Our opinion today is solely based upon well-established principles of statutory construction, not the facts of this case. Nevertheless, the record below does illustrate the difficulty with classifying the unauthorized substances tax as a proper levy under the merchants and peddlers provision. The proof introduced at trial established Waters' livelihood as carpentry, and not, absent inferences from his possession of a large amount of the drug, as a "merchant" or "peddler" of cocaine.[50] Waters was subject to tax liability, however, upon his possession of the requisite amount of cocaine to qualify as a "dealer" as the term is defined in the legislation. An individual may be subject to the unauthorized substances tax, as written, even if the evidence does not establish that he or she qualifies as a merchant or a peddler of the substances.

Our analysis of the applicability of the merchants and peddlers provision of article II, section 28 might be different if the legislature had statutorily defined "dealers" as those who sell or intend to sell unauthorized substances, rather than those in possession of the illegal drugs.[51] As written, however, the statute does not authorize a tax on persons who sell, barter, or exchange unauthorized substances for value. Instead, the plain language places a tax on those who merely possess illegal drugs. In consequence, the tax does not fall within the merchants and peddlers classification under article II, section 28.

### C. Privilege Taxes

Because it is not a tax on merchants and peddlers, the tax on unauthorized substances may only be sustained, if at all, as a tax on privileges under article II, section 28. Indeed, the tax on

---

[50] Although Waters pleaded guilty in January 2008 to the Class B felony of possession of cocaine with intent to deliver, this plea was entered thirty-two months after Waters was assessed with the tax and seventeen months after the hearing on his declaratory judgment action.

[51] Unlike Tennessee, a number of other states have included individuals who sell or transfer drugs as among those subject to the tax. See, e.g., Ala. Code § 40-17A-1(3) (defining "dealer" as "[a] person who . . . manufactures, produces, ships, sells, uses, distributes, transports, or imports . . . or in any manner acquires or possesses" marijuana or a controlled substance); Ky. Rev. Stat. Ann. § 138.870(4) (defining "taxable activity" as "producing, cultivating, manufacturing, importing, transporting, distributing, acquiring, purchasing, storing, selling, using, or otherwise possessing" marijuana or a controlled substance). Other states appear to have focused their drug stamp tax statutes exclusively on the sale or transfer of the drugs. See 35 Ill. Comp. Stat. 520/2 (defining "dealer" as "a person who . . . manufactures, produces, ships, transports, imports, sells or transfers or possesses with intent to deliver to another person" the cannabis or controlled substance); Nev. Rev. Stat. § 372A.070(1) (imposing tax on those who "sell, offer to sell or possess with intent to sell a controlled substance" without first registering as a dealer and paying the prescribed tax).

unauthorized substances, as written, is more defensible as a tax on privileges than as a tax on merchants and peddlers. The language of the statute suggests that the legislature intended the tax to be one on privileges.[52] First, the statute was codified under Title 67, Chapter 4; that chapter of the Tennessee Code Annotated is entitled "Privilege and Excise Taxes." The designation is significant because we have used the terms "privilege tax" and "excise tax" interchangeably. Senter, 260 S.W. at 148 ("Whether the tax be characterized in the statute as a privilege tax or an excise tax is but a choice of synonymous words, for an excise tax is an indirect or privilege tax."); see also Foster & Creighton Co. v. Graham, 285 S.W. 570, 573 (Tenn. 1926). Secondly, section 67-4-2803 of the statute is entitled "Excise tax – Methods of measuring quantities." Further, there also are internal references in the legislation to the unauthorized substances tax as an "excise tax."[53] In our view, the use of the term "excise tax" is a strong indication that the General Assembly intended to tax the "privilege" of possessing unauthorized substances as empowered by article II, section 28 of our constitution.

As an initial matter, privileges designate a larger and more indefinite class of objects of taxation than merchants and peddlers. Phillips v. Lewis, 3 Tenn. Cases 230, 240 (1877). The "fixed legislative and judicial definition" of the term "privilege" as adopted in the 1870 Constitution was set forth by Chief Justice A.O.P. Nicholson in Jenkins:

> What are privileges, is a question of construction dependent upon the general law.
> We have defined it in several cases to be, the exercise of an occupation or business,
> which require a license from some proper authority, designated by a general law, and
> not open to all, or any one, without such license. It is a power of the Legislature
> alone to create privileges, and forbid their exercise without license.

55 Tenn. at 475 (quoting Mayor of Columbia v. Guest, 40 Tenn. (3 Head) 413, 414 (1859)); see also Wiltse & Pratt v. State, 55 Tenn. (8 Heisk.) 544, 547 (1873) (noting "that the word privileges was adopted and retained in the Constitution of 1870, in the sense in which it was used in the Constitution of 1834, as ascertained and settled by judicial interpretation"). The earliest cases to consider the topic defined a "privilege" as any activity or occupation that could not be enjoyed without legal authority, which is conferred by way of a license from the state that requires payment. See, e.g., Cate v. State, 35 Tenn. (3 Sneed) 120, 121-22 (1855); Mabry v. Tarver, 20 Tenn. (1 Hum.) 93, 98 (1839) (holding that a privilege "is the license or permission, upon the specified terms, to do that which in general is prohibited").

Numerous opinions of this Court from the nineteenth and early twentieth centuries suggested that the legislature's power to tax privileges under article II, section 28 was virtually without limitation. In one case, for example, this Court held that "[t]he power of the Legislature to declare

---

[52] By contrast, neither the word "merchant" nor the word "peddler" appears anywhere in the statute.

[53] See Tenn. Code Ann. § 67-4-2801 ("The purpose of this part is to levy an excise tax to generate revenue for state and local law enforcement agencies . . . ."); Tenn. Code Ann. § 67-4-2803(a) ("An excise tax is levied on unauthorized substances possessed, either actively or constructively, by dealers . . . .").

-35-

and tax privileges is unlimited," and "[i]ts discretion in this regard cannot be restrained or controlled by the courts." H.G. Hill Co. v. Whitice, 258 S.W. 407, 409 (Tenn. 1924); see e.g., Kurth v. State, 5 S.W. 593, 594 (Tenn. 1887) ("A privilege is whatever the legislature choose to declare a privilege, and to tax as such."); Jenkins, 55 Tenn. at 479 ("[T]he power of the Legislature to tax merchants, peddlars, and privileges, was unlimited and unrestricted, and might be exercised in any manner and mode in their discretion."). Certainly, the legislature has taxed manifold activities and occupations through the privilege tax. See, e.g., Madison Suburban Util. Dist. of Davidson County v. Carson, 232 S.W.2d 277, 280 (Tenn. 1950) (use tax); Hooten, 209 S.W.2d at 275 (sales tax); Humphries v. Carter, 112 S.W.2d 833, 834 (Tenn. 1938) (license to operate nursery or greenhouse); Corn v. Fort, 95 S.W.2d 620, 623-24 (Tenn. 1936) (tax on corporate capital); Foster & Creighton Co., 285 S.W. at 573 (tax on storage and sale of gasoline); Senter, 260 S.W. at 147 (corporate excise tax); Knoxville & Ohio R.R. Co. v. Harris, 43 S.W. 115, 119-20 (Tenn. 1897) (tax on operation of railroads).[54]

Given the vast discretion that the legislature has historically enjoyed in taxing privileges, the question naturally arises as to whether there exists any outer boundary on its power to classify activities or occupations as proper subjects of taxation. More recent cases have defined the term "privilege" with greater precision and, in our assessment, have established perimeters on the taxing authority of the state.

While earlier decisions described a privilege merely as a license by the legislature to do that which is otherwise prohibited, our more recent cases have considered the privilege tax as compensation from the taxpayers to the state in return for the protective environment that the state has provided for the activity or occupation in question. In Senter, the Court upheld an excise tax on corporate income. In so doing, it stressed the fact that corporations operating in Tennessee do so under the state's protection:

> Taxation of the privilege is upon the occupation or activity carried on amid the social, economic, and industrial environment, under protection of the state. Without the opportunity and protection afforded by the state, none of those classed and taxed as privileges could exist; every element that enters into the composition of a civilized state supplies them sustenance and strength; and it is often true that the visible property attendant upon the exercise of the privilege is inconsequential as compared to the earnings or profits flowing from the licensed activity or occupation.

> Excising the result of an occupation or activity in the modern state may be likened to the ancient custom of huntsmen sharing with the dispensing gods of bounty a small portion of the captured game.

---

[54] We also have made clear that the privilege tax can apply to a single act or transaction, Seven Springs Water Co. v. Kennedy, 299 S.W. 792, 793 (Tenn. 1927); State ex rel. Ormes v. Tenn. Finance Co., 269 S.W. 1119, 1119-20 (Tenn. 1925), and is not limited to a business or pursuit of an occupation. Knoxtenn Theatres v. Dance, 208 S.W.2d 536, 538 (Tenn. 1948) (purchase of theater tickets); Ogilvie v. Haley, 210 S.W. 645, 647 (Tenn. 1919) (operation of automobiles for pleasure).

Senter, 260 S.W. at 146 (internal citation omitted). Similarly, in upholding a tax on corporate capital, this Court has further observed as follows:

> Since a corporation can exist only subject to the will of the sovereign, its right to exist or to do business in corporate form is subject to such terms and restrictions as the state may place upon the right, including the payment of such taxes as the sovereign may exact for the privilege of existing or of doing business.

Corn, 95 S.W.2d at 623. The power to tax privileges, therefore, is restricted to those activities and occupations to which the state affords some measure of protection and support. In other words, "the Legislature cannot name something to be a taxable privilege unless it is first a privilege." Jack Cole Co. v. MacFarland, 337 S.W.2d 453, 455 (Tenn. 1960). A second significant limitation is that the legislature may not impose a privilege tax that is "arbitrary, capricious or wholly unreasonable." Hooten, 209 S.W.2d at 274; see, e.g., Corn, 95 S.W.2d at 624 (imposition of privilege tax "on a simple partnership, composed of individuals, and excepting the single individuals, who may, perhaps, be engaged in the same kind of business as the partnership . . . is arbitrary and capricious").[55]

By enacting the tax on illegal substances, the legislature did not tax an activity or occupation to which Tennessee has provided "sustenance and strength." Nor does the tax compensate the state for an activity that occurs under its protection.[56] To the contrary, the General Assembly has strictly prohibited the possession of all of the substances included in the definition of "unauthorized substances" in Tenn. Code Ann. § 67-4-2802(10). The legislature's wholesale prohibition on the possession of unauthorized substances cannot be reconciled with the classification of the same activity as a privilege. There is a sound basis for the pronouncement by the Court of Appeals that the General Assembly may not, even under its broad taxing power in article II, section 28, impose a privilege tax on conduct that is wholly prohibited.

Despite the inarguable logic in the proposition that an unlawful act does not qualify as a privilege, the Commissioner contends that our century-old decision in Foster v. Speed, 111 S.W. 925 (Tenn. 1908), provides a basis for upholding the tax on unauthorized substances as a privilege tax.

---

[55] Other cases have found the General Assembly's ability to tax privileges to be limited for reasons not applicable to the tax on unauthorized substances. As such, we need not address them here. See Evans v. McCabe, 52 S.W.2d at 162 (holding that "[a] restraint upon the power to tax incomes . . . is inevitably implicit in section 28 of article 2," specifically the clause taxing income derived from stocks and bonds that are not taxed ad valorem); Gallagher v. Butler, 378 S.W.2d 161,167 (Tenn. 1964) (reaffirming Evans); see also Jack Cole, 337 S.W.2d at 456 ("Since the right to receive income or earnings is a right belonging to every person, this right cannot be taxed as privilege.").

[56] The legislative history supports this proposition. During debate on the House floor, when Representative Susan Lynn (R-Mt. Juliet) wanted it "said for the record" that the General Assembly was not "recognizing . . . or legitimizing this industry" by taxing it, Representative Curtiss responded that it was "certainly not the intention of this legislation to legitimize drug trafficking or the sale of any illegal substance in the State of Tennessee." Statement of Rep. Curtiss, House Session, May 19, 2004.

Foster operated a retail liquor store in a location in Shelby County where, due to the proximity to a school, it was illegal to sell liquor. The clerk of court issued a distress warrant against Foster's business because he had failed to pay the tax on the retail sale of liquor imposed by the general revenue law of 1903. Foster paid the tax but then filed suit to recover the amount paid, arguing that "the Legislature did not intend to license and tax a business which could not be conducted lawfully." Foster, 111 S.W. at 925. The Court unanimously upheld the taxation of Foster's business even though its location was unlawful. Id. at 925-26; see also Carpenter v. State, 113 S.W. 1042 (Tenn. 1908) (reaffirming Foster).

Our ruling in Foster is distinguishable on the facts. While Foster's business was operating unlawfully because of its location, the retail sale of liquor was not, per se, an illegal activity. On the other hand, the possession of an unauthorized substance as defined in Tennessee Code Annotated section 67-4-2802(10) violates the general law regardless of its location. Our extensive research confirms that this Court has never upheld the constitutionality of a statute taxing completely illegal acts under the privilege powers. Because the General Assembly may not impose a privilege tax on an activity that it has otherwise declared to be unlawful, the tax on unauthorized substances exceeds even the broad taxing authority of the General Assembly under article II, section 28.

Our charge, as stated, is to uphold the constitutionality of a statute whenever possible, and to that end we have held that if a statute is partially unconstitutional, "it would be our duty to elide the provision objected to rather than to strike down the taxing statute." Int'l Harvester Co. v. Carr, 466 S.W.2d 207, 212-13 (Tenn. 1971). These circumstances, however, have generally involved broad, omnibus taxing statutes in which one provision is unconstitutional, but the remainder of the statute is sound. Id. at 213 (citing cases). In these situations, courts typically have chosen not to invalidate the entire statute, but have taken "a more reasonable view . . . that the part of the law providing for the improper exemption should be declared void." Id. In this instance, however, there is no way for us to strike down any particular offending provision within the statute without invalidating the entire tax. We cannot transform a tax on possessors of substances into a tax on merchants and peddlers, or classify an illegal activity to be a privilege, absent "amending" the statute by judicial fiat.[57] In our view, it is just such an "amendment" by the judiciary that would realize the dissent's fear of "short-circuiting the democratic process." Our only principled alternative, therefore, is to declare the entire statute unconstitutional.

## Conclusion

The statute taxing the possession of unauthorized substances does not violate the federal and state constitutional protections against self-incrimination and double jeopardy or abridge the guarantee of procedural due process. For different reasons, however, the statutory scheme cannot be characterized as imposing either a tax on merchants, a tax on peddlers, or a tax on privileges, as authorized under our state constitution. Obviously, this state prohibits the possession of cocaine.

---

[57] The dissent suggests that a "delicate operation" might save the legislation from the state constitution's limitations on the legislature's broad taxing powers. Nowhere, however, does the dissent identify any specific, objectionable portion of the statute that might be removed in order to bring the statute within the boundaries of article II, section 28.

As observed by our Court of Appeals, the possession of an illegal substance is no privilege. Further, the legislation at issue taxes only possessors and makes no reference to one who sells or, by virtue of the quantity of the cocaine or other factors, displays the intent to sell. Finally, we are not inclined to augment a statute in an effort to make it fit within the framework of the constitution. That responsibility falls within the capable hands of the General Assembly.

The judgment of the Court of Appeals is affirmed. Costs are taxed to Reagan Farr in his capacity as the Commissioner of Revenue for the State of Tennessee, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE