IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 1, 2021

IN RE BAILEY J. ET AL.

Appeal from the Juvenile Court for Hamblen County
No. 16227J   Janice Hope Snider, Judge

_____

No. E2021-00446-COA-R3-PT
_____

A mother appeals the termination of her parental rights to her twins.  The juvenile court terminated on grounds of abandonment by an incarcerated parent and substantial noncompliance with the permanency plans.  The court also determined that termination was in her children's best interest.  Mother argues that she lacked notice of the grounds and consequences of abandonment and the procedures for terminating her rights.  She also argues that the evidence of the grounds for terminating her parental rights and of her children's best interests was less than clear and convincing.  We conclude Mother waived her notice argument.  And while we agree that the evidence of substantial noncompliance with the permanency plans was less than clear and convincing, clear and convincing evidence does support the ground of abandonment by an incarcerated parent and the court's best interest determination.  So we affirm termination of Mother's parental rights.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and KRISTI M. DAVIS, JJ., joined.

Whitney P. Trujillo, Strawberry Plains, Tennessee, for the appellant, Crystal J.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

### A.

In May 2019, the Hamblen County Juvenile Court adjudicated nearly three-year-old twins, Bryce and Bailey, dependent and neglected in the care of their mother, Crystal J. ("Mother"). During a preliminary hearing in the same proceeding, Mother had tested positive for methamphetamine, oxycodone, and suboxone. The twins' father was incarcerated. So, the juvenile court granted temporary care and custody of the children to the Department of Children's Services ("DCS"). DCS placed the twins in a foster home.

Shortly after the removal of the twins from Mother's custody, DCS and Mother created a permanency plan. According to the testimony of a DCS case worker, the plan required Mother to complete an alcohol and drug assessment, a mental health assessment, and a parenting assessment. It also required her to obtain and maintain safe and stable housing. And it required her to resolve all legal issues and refrain from incurring new ones.

Due to her positive drug test, the juvenile court only allowed Mother once weekly telephone calls with Bryce and Bailey, which were to be monitored by the foster parents. Mother exercised her phone visitation fairly regularly from May to December 2019, at which point she was incarcerated for violating probation. Her incarceration followed a positive test for methamphetamine. Mother was released in February 2020.

Around the time of her release, DCS and Mother created a new permanency plan. Some of the new plan's requirements carried over from the first plan. The new plan again required Mother to complete alcohol and drug assessments because of continued drug use and drug arrests. Mother still had to attend parenting classes and acquire appropriate housing for her and the children. And Mother still had to refrain from any new criminal charges and resolve any legal issues. As a new requirement, Mother had to complete an in-patient drug treatment program.

### B.

A few months after Mother's release from jail, DCS filed a petition to terminate her parental rights.[1] As grounds, the petition alleged abandonment by an incarcerated parent

---

[1] DCS also petitioned to terminate the father's parental rights. He did not contest the petition, and his parental rights are not at issue in this appeal.

both by failure to visit and wanton disregard and substantial noncompliance with the permanency plans.[2]  The trial focused on Mother's drug use and criminal behavior, the extent of her visitation, and her compliance with the permanency plans.

DCS sought the children's removal from Mother's custody because of allegations that the twins were drug exposed.  Mother had about three weeks of clean drug screens right before the March 2021 trial and claimed she no longer used drugs.  But she admitted using methamphetamine "five or six" times since the children's removal from her custody.  She also admitted using hydromorphone without a prescription.  Prior to her most recent incarceration, she never submitted to random drug tests.

Mother had been on probation since 2016 for methamphetamine.  She was still on probation at the time of trial and had a current charge pending for violating probation.  Mother had previously violated her probation four times, all since the removal of the twins from her custody.  Three violations were drug-related, two for the use of methamphetamine and the third for hydromorphone.  The fourth violation was for theft under a thousand, for which Mother was convicted.  Mother was incarcerated three times after Bryce and Bailey were removed from her custody.

Mother's struggles with drugs and the legal system impacted her visitation with the twins.  She was unable to visit them in-person because of her drug use.  And, after her prison stint from December 2019 to February 2020, she did not exercise her phone visitation anymore.  Before her incarceration, Mother claimed that she participated in phone visitation every week.  But the foster parents noted that Mother missed some weeks.  Mother had not seen Bryce and Bailey since they were removed from her custody.  And, at the time of trial, Mother had not spoken with the children in any way in "probably nine months."

Mother also did not complete several requirements of the permanency plans.  She did not submit to random drug tests.  She did not complete an in-patient drug treatment program.  She also did not attend parenting classes.  Nor did she resolve her legal issues or refrain from incurring new ones.

As for Bryce and Bailey, they had lived in their foster home for nearly two years at the time of trial.  They had adjusted well and were happy and healthy.  They had a good relationship with their foster parents, who wanted to adopt them.  They also had a relationship with the foster parents' extended family.

---

[2] The petition also alleged abandonment by failure to visit, abandonment by failure to provide a suitable home, persistence of conditions, and failure to manifest an ability and willingness to parent.  These grounds were either voluntarily dismissed by DCS or dismissed by the court following the trial.

After the trial, the juvenile court terminated Mother's parental rights. The court found that Mother abandoned Bryce and Bailey both by failure to visit and by wanton disregard. The court also found substantial noncompliance by Mother with the permanency plans. And the court found that terminating Mother's rights to the twins was in their best interests.

## II.

As a threshold issue on appeal, Mother claims that she was not given notice of the law relating to abandonment, the consequences of abandonment, or the procedures for terminating parental rights. When DCS creates a permanency plan, the plan must "include a statement of responsibilities between the parents, the agency[,] and the caseworker of such agency." Tenn. Code Ann. § 37-2-403(a)(2)(A) (Supp. 2020). The statement must "include the definitions of 'abandonment' and 'abandonment of an infant,'" as well as "the criteria and procedures for termination of parental rights." *Id.* The court then "must review the proposed plan." *Id.* And the parent is entitled to notice of the court's review of the plan. *Id.* § 37-2-403(a)(2)(B)(i). The court must "explain on the record the law relating to abandonment . . . and shall explain that the consequences of failure to visit or support the child will be termination of the parents' . . . rights to the child." *Id.* Mother contends that she did not properly receive the notice and explanation. But she did not make this argument at trial.

"It is well settled that matters not raised at the trial level are considered waived on appeal." *Eagles Landing Dev., LLC v. Eagles Landing Apartments, LP*, 386 S.W.3d 246, 254 (Tenn. Ct. App. 2012) (citing *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009)). This rule applies to an attempt to raise an issue of notice for the first time on appeal. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013) (holding that whether a father "receive[d] notice of the grounds for abandonment prior to the filing of the termination petition" was waived when not first raised in the trial court). Mother waived her argument that she was not provided with proper notice under Tennessee Code Annotated § 37-2-403.

## III.

Mother also challenges the grounds on which the juvenile court terminated her rights and whether termination was in the twins' best interests. Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2020). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interests. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the fact sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

The juvenile court terminated Mother's parental rights on the grounds of abandonment by an incarcerated parent and substantial noncompliance with the permanency plans. As to the first ground, we examine abandonment by failure to visit and by wanton disregard separately.

1. Abandonment by Incarcerated Parent

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). There are "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2020) (defining the term "abandonment"). One definition applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period before the termination petition was filed. Tenn. Code Ann. § 36-1-102(1)(A)(iv). Here, the parties stipulated that Mother was incarcerated from December 6, 2019, to February 17, 2020, within the four-month period before the petition was filed on May 22, 2020.

a. Failure to Visit

Among other ways, an incarcerated parent abandons her child by failing to visit the child "during an aggregation of the first one hundred twenty (120) days of nonincarceration immediately preceding the filing of the action." *Id.* § 36-1-102(1)(A)(iv)(b). Here, the applicable abandonment period is the aggregate of November 10, 2019, to December 5, 2019, and February 18, 2020, to May 21, 2020. *See id.* § 36-1-102(1)(K) (explaining that "aggregation is accomplished by counting the days preceding, following, and in-between each period of incarceration"); *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) ("[T]he applicable four month window . . . includes the four months preceding the day the petition . . . is filed but excludes the day the petition is filed."). Whether "a parent failed to visit . . . a child is a question of fact." *In re Adoption of Angela E.*, 402 S.W.3d at 640.

At the time of trial, Mother had not seen Bryce and Bailey face-to-face in almost two years. The juvenile court restricted Mother to telephone contact with her children until such time as she provided proof that she had not used methamphetamine for 30 days. While Mother never provided such proof, she claimed that she had regular, weekly calls with the children until she was incarcerated in December 2019. The foster mother disputed Mother's testimony.

The court found "that during the relevant 120 day time period applicable in this case, [Mother] failed to exercise even her telephone visitation." In doing so, the court apparently credited the foster mother's testimony. And we find no basis in this record to overturn the court's credibility finding. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). Clear and convincing evidence supported terminating Mother's rights for abandonment by failure to visit.[3]

b. Wanton Disregard

An incarcerated parent also abandons her child if she "[h]as engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). "Wanton disregard" is not a defined term. *See In re*

---

[3] Even had the court credited Mother's testimony regarding her phone calls, a parent fails to visit if she engages in only token visitation. *See* Tenn. Code Ann. § 36-1-102(1)(E) (defining "failure to visit"). Token visits are "nothing more than perfunctory" or are so infrequent or short "as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(C). According to foster mother, Mother's calls were of short duration, lasting only 10 to 15 minutes. At best, Mother's calls were merely token. *See In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 n.17 (Tenn. Ct. App. June 16, 2011) ("[I]n light of [the child's] age, . . . the sporadic short telephone conversations during the determinative time period constituted at most . . . 'token' visitation.").

*Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at \*2 (Tenn. Ct. App. June 9, 2015). But "actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *Id.* at \*3. The court may consider all evidence relevant to determining "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Among other things, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

Here, Mother was on probation since 2016 for methamphetamine. Before her incarceration in December 2019, Mother violated her probation by committing theft under a thousand, for which she was convicted and sentenced to prison. She also violated probation two other times by failing drug tests for methamphetamine, one of which led to her December 2019 incarceration. Mother's drug use and criminal behavior led to the removal of the twins from her custody and kept her from visiting them.

Even after the filing of the petition to terminate parental rights, her problems continued. She was sent to prison again in October 2020 for violating probation by failing a drug test for hydromorphone. She was still on probation at the time of trial and had another charge pending for violating probation.

A month before trial, Mother was able to provide "about three weeks" of clean drug tests. And, around the same time the petition was filed, she began taking drug rehabilitation more seriously. But we find these improvements were "too little" and "too late." *See In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). As Mother concedes, similar facts have supported a finding of wanton disregard. *See, e.g.*, *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard . . . can be established by the parent's previous criminal conduct along with a history of drug abuse."). Clear and convincing evidence supported terminating Mother's rights for abandonment by wanton disregard.

2. Substantial Noncompliance with the Permanency Plans

The trial court also terminated Mother's rights on the ground of substantial noncompliance with the permanency plans. But, as Mother argues, the permanency plans were not admitted into evidence during the termination of parental rights trial. "A termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding." *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004). We have "repeatedly held that 'when DCS is relying on substantial noncompliance with the permanency plan as a ground for termination of parental rights, it is essential that the plan be admitted into evidence.'" *In re Cloey R.*, No. E2014-00924-COA-R3-PT, 2015 WL

273685, at *9 (Tenn. Ct. App. Jan. 21, 2015) (quoting *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *4 (Tenn. Ct. App. Nov. 28, 2006)). Because the plans were not admitted into evidence here, Mother's rights could not be terminated on the ground of substantial noncompliance with the permanency plans.[4]

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in its best interests analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). Mother continuously struggled with drugs and the legal system. She only had approximately three weeks' worth of clean drug tests leading up to the trial. And she was still on probation and had recently violated probation again.

Similarly, the second factor considers the parent's potential for lasting change "after reasonable efforts by available social services agencies." *Id.* § 36-1-113(i)(2). Mother argues that DCS's efforts were not reasonable. But the evidence does not preponderate against the court's finding that they were. DCS provided resources for Mother to complete alcohol and drug assessments and parenting assessments. *See In re Glory A.W.*, No. E2013-02303-COA-R3-PT, 2014 WL 5361376, at *12 (Tenn. Ct. App. Oct. 21, 2014). DCS also worked with Mother to enter an in-patient drug rehabilitation program. But Mother did not complete the recommendations from the alcohol and drug assessments or attend the parenting classes. Only "at times" did Mother show a willingness to seek in-patient treatment. Ultimately Mother did not attend rehabilitation.

---

[4] Mother argues, and DCS agrees, that none of the exhibits in the record were properly admitted into evidence. So, Mother claims that no reliance may be placed on the exhibits. *See* TENN. R. APP. P. 8A(c) ("[A]ny portion of a juvenile court file . . . that has not been properly admitted into evidence at the termination of parental rights trial shall be excluded from the record."). We agree. In reviewing the evidence of the grounds for termination and the children's best interests, we consider only the testimony offered at trial and not the exhibits.

The third factor looks at whether the parent has maintained regular contact with the child. Tenn. Code Ann. § 36-1-113(i)(3). At the time of trial, Mother had not seen Bryce and Bailey in almost two years. She had not spoken to them in nine months. Under the fourth factor, Mother also lacked a meaningful relationship with the twins. *See id.* § 36-1-113(i)(4). The last time Mother spoke with the twins, she did not connect well with them. According to the foster mother, the twins no longer talk or ask about Mother.

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). As the court found, Bryce and Bailey had lived with their foster parents for almost half their lives. The twins viewed the foster parents as their parents. The foster parents offered care and stability while Mother could not. The evidence does not preponderate against the court's finding that returning the twins to Mother "would have a damaging effect on their emotional well-being."

The sixth factor asks whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child." *Id.* § 36-1-113(i)(6). Because the order adjudicating the twins dependent and neglected in Mother's care was not entered into evidence, DCS offered no evidence addressing this factor. We consider the sixth factor as weighing against terminating Mother's parental rights. The seventh factor looks at the parent's home environment and whether the use of alcohol or controlled substances would prevent the parent from properly caring for the child. *Id.* § 36-1-113(i)(7). The court found that the environment of Mother's home was uncertain. So we also treat this factor as weighing against termination.

The eighth factor evaluates whether the parent's mental or emotional status prevents proper parenting. *Id.* § 36-1-113(i)(8). As the court found, Mother's struggle with drugs did "not reflect favorably on her mental or emotional status." Lastly, the ninth factor examines the parent's child support history. *Id.* § 36-1-113(i)(9). Mother had not provided support for the twins since they had been in foster care. She only sent them gifts for Christmas and on birthdays.

In sum, two best-interest factors weigh against terminating Mother's parental rights. But "the combined weight of the facts 'amount[s] to clear and convincing evidence that termination is in the [twins'] best interest.'" *See In re Carrington H.*, 483 S.W.3d 507, 523 (Tenn. 2016) (alteration in original) (quoting *In re Kaliyah S.*, 455 S.W.3d at 555).

## IV.

Mother waived her argument that she lacked notice of the grounds and consequences of abandonment and the procedures for terminating her rights by failing to raise the issue at trial. Upon our review, we conclude that clear and convincing evidence supported two of three grounds relied on by the trial court for terminating Mother's parental

rights. We also conclude that terminating Mother's parental rights was clearly and convincingly in the children's best interests. So we affirm the termination of Mother's parental rights.

_s/ W. Neal McBrayer_

W. NEAL McBRAYER, JUDGE
